523 So.2d 538 (1988)
William BUSH
v.
STATE.
3 Div. 46.
Court of Criminal Appeals of Alabama.
January 26, 1988.
Rehearing Denied March 8, 1988.
Certiorari Denied April 29, 1988.
*541 Dennis N. Balske, Balske & Van Almen, Montgomery, and Rick Harris and Stephen R. Glassroth of Moore, Kendrick, Glassroth, Harris & White, Montgomery, for appellant.
Charles A. Graddick, Atty. Gen., and William D. Little, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 87-727.
PATTERSON, Judge.
Appellant, William Bush, was indicted on September 11, 1981, in a four-count indictment for the capital offense of murder of Larry Dominguez during a robbery in the first degree or an attempt thereof, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. Each count of the indictment alleges the same offense based on the same facts, but each is worded slightly differently, and two of the counts include alternative allegations of attempted robbery.[1]
Appellant was duly arraigned on September 28, 1981, and pleaded not guilty and not guilty by reason of insanity. A jury found him guilty on November 18, 1981, of the capital offense as charged and, after a sentencing hearing, unanimously recommended punishment by death. After a separate sentencing hearing, the trial court accepted the jury's recommendation and sentenced appellant to death. On appeal, this court affirmed appellant's conviction and sentence of death. Bush v. State, 431 So.2d 555 (Ala.Cr.App. 1982). Affirmance by the Supreme Court of Alabama followed. Bush v. State, 431 So.2d 563 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).
Subsequently, appellant filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Alabama and, on March 19, 1984, pursuant to a stipulation between the state and appellant, the federal court ordered that the writ would be granted unless the state granted appellant a new trial within 180 days. This action was precipitated by a conflict of whether the prosecution had given to the defense a police memorandum showing that the only eyewitness to the murders had identified a person other than appellant as the assailant. It was conceded that if the exculpatory information had been turned over to trial counsel, counsel's failure to develop it at trial would have constituted a Sixth Amendment violation, and if it was not turned over, it would have constituted a Fifth Amendment violation. On these alternative bases, a new trial was required.
A new trial was ordered on the same four-count indictment. It began on May 14, 1984, and culminated with the following *542 jury verdict on May 16, 1984: "We, the jury, find the defendant guilty as charged in the indictment, capital murder." On May 17, 1984, the jury, after a separate sentencing hearing and by a vote of eleven to one, recommended the advisory verdict of death. The trial court then held a second sentencing hearing and found the existence of three aggravating circumstances and no mitigating circumstance. The trial court did note in its findings that appellant presented witnesses who stated that he was a "good person; that he had been a good brother, son and friend." The trial court weighed the aggravating circumstances, while taking into consideration all the evidence offered during the trial of the case and all circumstances and evidence offered on behalf of and pertaining to appellant, and on June 13, 1984, sentenced appellant to death, thereby accepting the death penalty as recommended by the jury. It is from this second conviction and sentence that appellant now prosecutes this appeal.
The state presented evidence showing that around 3:00 a.m., on July 26, 1981, appellant and a companion, Edward Lewis Pringle,[2] entered a Majik Market convenience store on Carter Hill Road in Montgomery, Alabama. When they entered, two people were in the store: Larry Dominguez, the store clerk, and his friend, Tony Holmes. Dominguez was in the restroom. Appellant pointed a pistol at Holmes and forced him toward the restroom at the rear of the store. When Dominguez opened the restroom door, appellant shot both Dominguez and Holmes with the pistol. Appellant then returned to the front of the store and attempted to open the cash register. Dominguez stumbled out of the restroom, and appellant shot him again. Appellant took two bags of "zodiac sign tags" from the store and departed. The first shot striking Dominguez passed through his chin, lodging in his neck and severing a large artery. The second shot striking Dominguez entered his right shoulder and passed through his lungs and heart. He died from the injuries caused by the second shot; however, the injuries sustained as a result of the first shot were potentially fatal. Holmes was shot in the neck and, although seriously injured, survived. He was able to give a description of his assailant and of the getaway automobile. He described the automobile as a 1973 whiteover-green Chevrolet Monte Carlo.
After leaving the Majik Market, appellant and Pringle drove to a Seven-Eleven convenience store on Narrow Lane Road in Montgomery, arriving there sometime prior to 4:00 a.m. Appellant entered the store and purchased a package of cigarettes from the clerk, Thomas Adams. After Adams opened the cash register, appellant forced him into an office area behind the counter and shot him in the head with the same pistol he had used to shoot Dominguez and Holmes. The shot to Adams's head apparently killed him instantly. Appellant took from $20.00 to $30.00 from the cash register.
Appellant did not testify at the guilt phase or at the sentencing phase of his trial. It is apparent from the arguments of his counsel, cross-examination of the state's witnesses, and questions asked defense witnesses, that his defense was based upon a theory of mistaken identity. He attempted, in every way possible, to bolster Holmes's identification of Edward Pringle's brother, Cornelias Pringle, as the triggerman, while at the same time trying to discredit the testimony of Patricia Pringle, the wife of Edward Lewis Pringle, who testified that appellant had told her that he had shot Dominguez, Holmes, and Adams. He endeavored to point the finger of suspicion *543 at Edward and Cornelias Pringle and away from himself. Cross-examination of the officers and arguments to the jury show an attempt to discredit appellant's incriminating statements. Appellant attempted to make it appear that the statements had been coerced and that the words in the statements were not appellant's but the officers'. In other words, the thrust of defense counsel's argument is that the officers had made up the statements and forced appellant to adopt them as his own. Defense counsel attempted to explain appellant's knowledge of the whereabouts of the murder weapon by claiming that appellant purchased it from someone on the street after the robbery-murders and prior to the time he was arrested. Counsel based this explanation on an investigator's testimony that appellant had told him that he had purchased the pistol after the crimes had been committed.
Twelve issues are raised by appellant on appeal.

I
Appellant first contends that the police arrested him without probable cause and that his subsequent custodial statements and the pistol seized as a result of his arrest should have been suppressed. He principally relies upon Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed. 2d 824 (1979), which holds that confessions obtained during an illegal detention are inadmissible even if the Fifth Amendment is complied with unless there has been a sufficient break in the causal connection between the illegality and the confessions. The exclusionary sanction clearly applies to confessions or statements of the accused obtained during an illegal arrest or detention as well as to other fruits of his illegal arrest. Ex parte Meeks, 434 So.2d 844 (Ala.), on remand, 434 So.2d 848 (Ala.Cr. App.1983).
We first must determine if there was an arrest. While there appears to be some reluctance on the part of the officers to characterize the detention of appellant as an arrest, we conclude, after reviewing all the facts and circumstances, that appellant was actually arrested at his home and transported to police headquarters, where the interrogation took place. In determining whether a person is in custody at a given time, the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); McCants v. State, 459 So.2d 992 (Ala.Cr.App.1984). It is clear that appellant was taken into custody at his home and subjected to the actual control and will of the arresting officers. See Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Waldrop v. State, 462 So.2d 1021 (Ala.Cr.App. 1984), cert. denied, 462 So.2d 1021 (Ala.), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1985); 6A C.J.S. Arrest § 2 (1975).
We next determine the question of whether the police had sufficient probable cause to validly arrest appellant without a warrant, for in order for a warrantless arrest to be valid, the arresting officer must have probable cause to make the arrest. See Waldrop v. State; Foy v. State, 387 So.2d 321 (Ala.Cr.App.1980); Braxton v. State, 350 So.2d 753 (Ala.Cr.App.1977); § 15-10-3(3). The arresting officer does not have probable cause unless he is possessed of information upon which, if submitted to a magistrate, a warrant would be issued. Ex parte Meeks; Knight v. State, 346 So.2d 478 (Ala.Cr.App.1977). "Probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonable trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Knight, 356 So.2d at 481. "Probable cause is concerned with `probabilities,' that `are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Carter v. State, 435 So.2d 137, 139 (Ala.Cr.App.1982) (quoting Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949)).
*544 Prior to appellant's arrest, the police had obtained the following information: (1) Edward Pringle's wife, Patricia Pringle, had told the police that appellant and her husband had told her that they had committed the crimes; (2) shortly after the robberymurders and at the mobile home of Edward Pringle and his wife, the police had discovered a vehicle with its motor still warm and fitting the description of the getaway car which they had been furnished by the surviving victim, Holmes; (3) an informant in Pensacola, Florida, who had been described by the Pensacola authorities to the Montgomery police officers as highly reliable, had told the police that appellant and Edward Pringle were involved in the commission of the crimes; (4) another informant in Montgomery had told the police that he had been told by "other people" that appellant and Edward Pringle were involved in the crimes, and that Edward Pringle had been seen driving a white-over-green Monte Carlo automobile which fit the description of the automobile used in the commission of the crimes; (5) Patricia Pringle had access to a white-over-green Monte Carlo automobile which belonged to her employer and fit the description of the getaway car; (6) Patricia Pringle also had access to an orange four-wheel-drive "suburban" automobile which belonged to her employer and which fit the description of an automobile driven by a black male who attempted to cash a check which had been stolen from victim Adams; and (7) the physical description of the perpetrator of the murder and robbery at the Majik Market and a description of the getaway car furnished by the victim, Holmes.
As noted, some of the information upon which the officers relied to arrest appellant was gained from informants. In Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), the Aguilar-Spinelli test was abandoned in favor of the "totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations." See also Waldrop v. State; McCants v. State. The Supreme Court in Gates clarified its prior holdings in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), by stating:
"[A]n informant's `veracity', `reliability,' and `basis of knowledge' are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case.... Rather, ... they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is `probable cause' to believe that contraband or evidence is located in a particular place."
462 U.S. at 230, 103 S.Ct. at 2328. The officers had little information from which they could test the veracity of the two confidential informants or the basis of their knowledge. While, in our opinion, the information obtained from the confidential informers would have been insufficient, standing alone, to establish probable cause, it is proper to consider their information as part of the totality of the circumstances in determining the existence of probable cause. The fact that two unrelated informers from different cities furnished the same information is worthy of some consideration.
All persons who furnish information about crimes to the police are informers in a sense; however, victims, witnesses, and average citizens whose identities are known, are not the same as paid confidential police informants and are not to be viewed in the same light. In cases where police have acted, or seek authorization to act, primarily upon information from the victim of, or a witness to, a crime, it is appropriate to give separate consideration to the matter of veracity and basis of knowledge. 1 W. LaFave Search and Seizure § 3.4 (2d ed. 1987). Courts are much more concerned with veracity when dealing with an informer instead of a victim or witness who is an average citizen. United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). The modern view is that, as a general proposition, any person purporting to be a crime victim or *545 witness may be presumed reliable, though the police must remain alert to the existence of any circumstances which would make that presumption inoperative in a particular case, such as, for example, any possible motive of the victim to falsify. United States v. Phillips, 727 F.2d 392 (5th Cir.1984); 1 W. LaFave, supra, at § 3.4(a).
The strongest evidence which the police possessed to support their conclusion that they had probable cause to arrest appellant was that provided by Patricia Pringle, who revealed that appellant had told her that he was involved in the commission of the crimes. We find that Patricia Pringle clearly had a reliable basis for her statement. Appellant and her husband, Edward Pringle, told her that they had committed the crimes. Admissions of crime carry their own indicia of reliability, sufficient at least to support a finding of probable cause. United States v. Harris. Moreover, it is important to note that her statement not only incriminated appellant, but also incriminated her husband. There is nothing in the record that discloses any hostile feelings between Patricia Pringle and her husband that might have caused her to fabricate a story to incriminate him. A close relationship between an informant and a person incriminated by the informant's statement strongly supports a finding of credibility. United States v. Dien, 609 F.2d 1038 (2d Cir.1979); Parker v. United States, 407 F.2d 540 (9th Cir.1969); Waldrop v. State. It is possible that she may have been upset because appellant and her husband used her employer's automobile in committing the robbery-murders, but if she was, it is not reflected in the record. It appears more likely that she was cooperating in an effort to clear up the matter pertaining to the use of the automobiles, and this cooperation lends weight to her credibility.
Appellant makes much of the facts that a reward had been offered for information concerning the commission of the crimes; Patricia Pringle knew of this reward when she gave the information to the officers; and she ultimately received some of the reward money. We do not believe that these circumstances necessarily detract from the reliability of her information. The fact that a private citizen is eligible for a reward does not make him a paid informer. The obvious distinction is the fact that the paid informer receives his money immediately upon his communication to the authorities, while the reward recipient does not receive the reward until the validity and truth of his evidence have been established through the judicial process. People v. Stevens, 98 Ill.App.3d 158, 53 Ill.Dec. 536, 423 N.E.2d 1340 (1981). Moreover, the police had information that served to corroborate her statement. The police knew that an automobile matching the description of the getaway car, with its motor still warm, had been parked at the Pringle residence only a short time after the commission of the crimes. The officers also knew that Patricia Pringle had access to a van similar to one used by someone trying to cash a check taken in one of the robberies.
Appellant correctly points out that the only surviving eyewitness, Tony Holmes, identified someone other than appellant and Edward Pringle in photographic and live lineups. He, in fact, identified the brother of Edward Pringle. At first glance, this would appear to cast uncertainty on the veracity of Patricia Pringle; however, the record discloses that the severe injuries suffered by Holmes may have affected his recollection of the events and his reasoning. He had great difficulty communicating with the officers for several days, and the officers suspected he was mentally deficient, which later proved to be the case. It is apparent from the record that the officers were skeptical of his identification from the very beginning. It should be pointed out, however, that his identification of the getaway vehicle proved to be accurate.
In reviewing the information available to the officers in the light of the totality-ofthe-circumstances approach, we conclude that the trial court correctly found that there was probable cause for the arrest of appellant. There was sufficient reliable information to warrant a finding of probable cause, thus, making appellant's arrest valid.

*546 II
Appellant next contends that his custodial statements and the pistol seized as a result of the warrantless arrest should have been suppressed because the police arrested him without a warrant and inside his home. He principally relies on Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The attorney general argues that Payton does not apply, for there was no entry into appellant's home within the meaning of Payton and the arrest occurred in a public place. The attorney general contends that appellant answered the door in response to a knock by the police and that, while "technically remaining inside the threshold of his house, voluntarily exposed himself to public view and thus to arrest." In pressing this argument, the attorney general relies on United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). The attorney general argues in the alternative that, if the arrest was not in a public place but one falling under Payton, the arrest was still valid as being made pursuant to exigent circumstances.
An arrest without a warrant may be made in a public place on probable cause without exigent circumstances. United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The Supreme Court has held that the Fourth Amendment prohibits police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest. Payton. In so holding, the Payton Court made it clear that such an entry may be proper where probable cause to arrest the suspect exists and there are exigent circumstances making it impossible or imprudent for a warrant to be obtained. 445 U.S. at 588, 590, 100 S.Ct. at 1381, 1382 (approving Dorman v. United States, 435 F.2d 385 (D.C.Cir.1970) (en banc)).[3] See Coolidge v. New Hampshire, 403 U.S. 443, 474-75, 91 S.Ct. 2022, 2042, 29 L.Ed.2d 564 (1971) (also approving Coolidge, 403 U.S. at 481-82, 91 S.Ct. at 2045-2046). However, the Court pointed out that, because the case before it involved routine arrests in which there was ample time to obtain warrants, the Court had "no occasion to consider the sort of emergency or dangerous situation, described in our cases as `exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or search." 445 U.S. at 583, 100 S.Ct. at 1378. The Court, thus, declined to consider the scope of an exception for exigent circumstances that might justify warrantless home arrests, thereby leaving to the lower courts the initial application of the exigent circumstances exception. Welsh v. Wisconsin, 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). However, the Court in Welsh, 466 U.S. at 749-50, 104 S.Ct. at 2097, cautioned,
"Prior decisions of this Court, however, have emphasized that exceptions to the warrant requirement are `few in number and carefully delineated,' ... and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches and arrests."
Factors which indicate the existence of exigent circumstances include: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public; and (6) the peaceful circumstances of the entry. See United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir.), cert. denied, ___ U.S. ___, 107 S.Ct. 2468, 95 L.Ed.2d 877 (1987); Dorman v. United States, 435 F.2d at 392-93; Musgrove v. State, 519 So.2d 565 (Ala.Cr.App.1986); McIntosh v. State, 443 So.2d 1275, 1281 (Ala.Cr.App.), rev'd and remanded on other grounds, 443 So.2d 1283 (Ala.1983); 2 W. LaFave, Search and Seizure § 6.1 (1987).
*547 In the instant case, appellant testified at the first suppression hearing, on November 10, 1981, in pertinent part, as follows:
"A. I was at home when the police arrived.... A knock come on the door and I answered the door.... I opened the door and walkedgot into the door. When I got to the door, about six officers rushed me and told me to put my hands up and asked me my name. So I told them, and they said, `You are under arrest'...."
Appellant testified at the second suppression hearing, May 3, 1984, in pertinent part, as follows:
"A. [A] knock come up on the door.
"Q. Did you answer the door?
"A. Yes.
"Q. Who was there?
"A. Police officers.
"Q. How many police officers came to the door?
"A. Anywhere from five to six police officers that I can remember.
"Q. What did the police officers do when they came to your door?
"A. Asked me was I named Chick.
"Q. Did they come inside your house or did they stay outside?
"A. They come inside.
"Q. When you had this first conversation with them, where were you?
"A. In my house.
"Q. Were they inside your house?
"A. Right.
"Q. Did they ask you what your name was?
"A. Right.
"Q. What did you tell them?
"A. Chick.
"Q. What did they say to you?
"A. They said they wanted to take me down for questioning.
"Q. Did they do anything to you?
"A. Yes.
"Q. What was that?
"A. Turnt [sic] me around and put the handcuffs on me."
The testimony of appellant in reference to the arrest is not contradicted in the record before us.
United States v. Santana, upon which the attorney general relies, is distinguishable from the case at bar. In Santana, police officers, who were acting on the basis of information that Santana had in her possession marked money used to make a heroin "buy" arranged by an undercover agent, went to Santana's house, where she was standing in the doorway and holding a paper bag. As the officers approached, she retreated into the vestibule of her house, where they caught her. Heroin was found in the bag, and some of the marked money was found on her person. The Court held that, while standing in the doorway of her house, Santana was in a public place for purposes of the Fourth Amendment, since she was not in an area where she had any expectation of privacy and was not merely visible to the public, but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to make a warrantless arrest in a public place upon probable cause and did not violate the Fourth Amendment. The Court further held that she could not, by retreating into her house, thwart an otherwise proper arrest that had been set in motion in a public place and that, since there was a need for the police to act quickly to prevent the destruction of evidence, the warrantless entry of the officers into her house to complete the arrest was proper under the doctrine of hot pursuit.
The distinctions between Santana and the instant case rest upon the facts that Santana was standing directly on the threshold of her door, rather than inside it, when the police arrived and her appearance was not procured by the police knocking on the door. The first distinction is important because of the Payton Court's clear language concerning the scope of the Fourth Amendment: "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn *548 a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 590, 100 S.Ct. at 1382. The second distinction is important because the "exigency" in Santana arose by chance, as the result of the defendant's being in her doorway when the police arrived. In this case, however, any exigency arising from appellant's answering the door and remaining inside his house was created solely by the police action in knocking on the door. Here, the police did not discover appellant inadvertently, but knew in advance that, by knocking at the door, they would find appellant in plain view and they intended to seize him. See Coolidge v. New Hampshire, wherein the Court held that although the Fourth Amendment permits police to seize incriminating objects that they discover inadvertently and in plain view, it prohibits seizure of objects that are not contraband, stolen, or dangerous in themselves, which the police know in advance they will find in plain view and which they intend to seize. Coolidge v. New Hampshire, supra.
The courts are split on whether Payton invalidates warrantless arrests occurring immediately after the defendant opens a door in response to a police knock. Some courts have upheld such arrests, citing Santana for the proposition that a doorway is a public place, while others have held that threshold arrests of this type are invalid under Payton. State v. Morse, 125 N.H. 403, 480 A.2d 183 (1984), and cases cited therein. We do not believe that Santana can be interpreted as validating all doorway arrests. It obviously does not cover those instances in which the police were not in "hot pursuit" to start with, but the defendant answered the police knock at his door and then retreated back into the premises upon seeing the police. 2 W. LaFave, supra, at § 6.1(e). See, e.g., United States v. Johnson, 626 F.2d 753 (9th Cir.1980), aff'd on other grounds, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982) (wherein the court held that a warrantless doorway arrest was unlawful where the defendant submitted upon being confronted by several police officers brandishing guns).
While we entertain some doubts as to whether the arrest was made in a public place and is one that can be justified under the rationale of Santana, we find it unnecessary to answer this question. Rather, we conclude that the warrantless entry of the premises was proper, upon our finding, as already noted, that there was probable cause to arrest appellant and, also, our finding that the facts presented sufficient exigent circumstances.
While at the residence of Mrs. Pringle's employer and after receiving the information from Mrs. Pringle in the early evening that appellant confessed to the commission of the crimes, the officers decided to go immediately to appellant's residence and arrest him. They effected the arrest within thirty minutes of their conversation with Mrs. Pringle. Officer R.S. Ward testified as follows:
"Q. [W]hat was the reason you needed to detain him ...?
"A. Because of the seriousness of the crimes that had been committed and the possibility that Mr. Bush might leave at any time. Another type crime like this could be committed. We knew that he had been to Pensacola on at least one occasion since this had occurred. We had stopped him the night before and wasn't sure if that scared him or not when we talked with him the night before. Mrs. Pringle, if I am not mistaken, also had mentioned something to the effect that he and Edward might go back to Pensacola. With this in mind, we were concerned that ... at any time he could leave. So we went to detain the subject with that in mind and, mainly, because of the crimes being as serious as what we were investigating. We certainly didn't want something like that to happen again."
The offenses were extremely grave and involved violence. In addition, as revealed by the testimony, there was a real likelihood that appellant would escape if not swiftly apprehended, especially since appellant's suspicion could have been aroused by *549 the police having stopped him the night before. Moreover, appellant's accomplice, as well as Mrs. Pringle, could have warned appellant at any moment. Upon these considerations, it was reasonable for the officers to conclude that appellant would leave the state before an arrest warrant could be obtained. In addition, the officers had every reason to believe that appellant was in his home at the time of the arrest and that he was armed. The entry was made peaceably, at a reasonable hour in the evening, and before appellant had retired. There was no unreasonable invasion of his privacy. This was an arrest that was made in the course of an ongoing investigation in the field and not a planned arrest made after a criminal investigation had been completed. Finally, from the evidence presented, it was reasonable to assume, given the nature of the crimes, that appellant was likely to commit another crime. We find that these factors demonstrate that appellant's arrest, though warrantless, was not a violation of his rights under Payton.
Since we hold that appellant's arrest was within the limits imposed by Payton, that is, that it was made with probable cause and exigent circumstances, there is no basis here for concluding that his statements made at the police station and the seizure of the murder weapon were tainted so that the statements and the weapon would have to be suppressed.

III
Appellant states his next contention as follows:
"Because the Montgomery police did not scrupulously honor the defendant's wish to remain silent, and because the interrogation of the defendant was inherently coercive, the defendant's subsequent confession was involuntary and violative of his Fifth Amendment rights, rendering it inadmissible during the prosecution's case-in-chief."
We view this contention as a challenge to the admissibility of both of his August 28, 1981, confessions. The attorney general argues that appellant did not express a wish to remain silent and that both confessions were voluntary and admissible. In the alternative, the attorney general argues that even if the appellant did express a desire to remain silent, the first confession was voluntary and its admission was harmless error because the second confession was admissible as a properly warned and voluntary confession. The attorney general also argues that, even if the first confession was both violative of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and involuntary, the second confession was sufficiently distinct from the first confession to render it free of the taint of the first confession and, thus, admissible. These arguments are based on Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and Martin v. Wainwright, 770 F.2d 918 (11th Cir.1985), modified on rehearing, 781 F.2d 185 (11th Cir.), cert. denied, ___ U.S. ___, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).
A suppression hearing was held on May 3, 1984. In addition to the testimony offered at the hearing, the transcript of the suppression hearing held on November 10, 1981, during the first trial of this case was introduced and made a part of the record by agreement. The record reflects the following: When appellant arrived at police headquarters, he was placed in an interrogation room which contained a desk and two chairs. The door to the room was left partially open. His right hand was handcuffed to a chair. He was questioned by Officers R.T. Ward and Ronnie Davis. The interview began at 11:00 p.m., August 27, 1981. Before questioning, Ward read appellant his Miranda rights and advised him that he and Davis wanted to question him about the robberies and murders. He acknowledged that he understood his rights, but refused to sign a waiver of rights form. For approximately three and one-half hours, appellant denied any knowledge of the crimes. During this period of time he asked to see Jessie Allen, the woman with whom he was living. The officers sent for her, and she visited privately with appellant for approximately 15 minutes. Shortly before 2:30 a.m., August 28, 1981, he advised the officers that he would talk with *550 them about the incidents. The questioning preceeding appellant's decision to discuss the incidents with the officers and the circumstances surrounding appellant's decision to make a statement were described by Davis, as follows:
"Q. Okay. What happened that he wouldn't talk, very reluctant, wouldn't sign a Rights Form or anything, and then all of a sudden, he just goes to saying anything, cooperating a hundred percent? What happened? What, in your opinion, happened?
"A. We got in thereme and Corporal Ward got in there and advised him of his rights, and he stated that he understood his rights; and he refused not [sic] to sign his Rights Form. At that time, we got to talking to him about his family. He has, if I remember right, two little girls. We got to talking to him about his little girl. And first of all, he wanted to know what we wanted to talk to him about. We told him that we had information that he was involved in two robberies and murders in Montgomery. All right. At that time, he appeared to be real uneasy to us.... We talked to him further.... I left at one time and went and got a Bible out of the Jail. And I come back and read him the Twenty-Third Psalm out of it. And I told him to hold the Bible, and we talked to him a little more. It was just investigative techniques on what to do. But after we talked to him a little further, he still wouldn't say nothing. I left the Bible with him, and me and Corporal Ward left the room. And that is the only time that I recall anybody else going into the room, and that was another investigator. And we stayed out of the room approximately a minute, maybe two minutes. Mr. Bush stated he wanted us to come back in the room. He wanted to talk to us. And at that time, myself and Corporal Ward went back in, and he told us about it."
The statement taken commenced at 2:30 a.m. and was completed at 3:17 a.m. and consisted of questions asked by Ward and answers given by appellant. The statement was recorded on tape and later transcribed. The statement shows that appellant was read his Miranda rights again and that he responded that he understood them. The statement also shows that he agreed to make a statement, and he acknowledged that he had not been promised anything and had not been threatened or pressured to make a statement. He gave his reasons for making the statement, as follows:
"Ward: Why did you decide to go ahead and tell myself and Cpl. Davis of these incidences?
"Bush: Because you know too much about the business. Somebody had to tell you something, you had to know something. In some of the things you picked out, you said, I know it could have come from one or two people.
"Ward: You felt like we already knew you was involved, is that why you told us?
"Ward: You're shaking you head yeah?
"Bush: Yeah."
In the statement, appellant admitted participating in the crimes. He stated that he and Edward Pringle robbed the Majik Market and that Pringle shot the two men during the robbery. He also admitted that he and Pringle robbed the Seven-Eleven store and that he shot the clerk during that robbery. Upon completion of this statement, the interrogation was concluded; however, appellant did not sign the statement at that time.
In the meantime, a statement was taken from Edward Pringle which differed from appellant's statement as to who shot the two men in the Majik Market robbery. Because of this discrepancy, appellant was interviewed again at 8:10 p.m., August 28, 1981, at the same location by Officer Ward. Appellant was read his Miranda rights again and he stated that he understood them; however, he refused to sign a waiver of rights form. Ward then read appellant's first statement to him, page by page, and appellant acknowledged each page to be true and initialed each page. Appellant did not want to sign the statement, so Ward called three officers in to be witnesses and asked appellant, in their presence, if *551 he had been given his Miranda warnings and if the statement were true. Appellant acknowledged that he had been so warned and that the statement was true. The officers then initialed the statement. After further questioning, appellant stated that he wanted to sign a waiver of rights form, which he did, and then he signed the statement which he had given earlier in the day. This signing occurred at 8:55 p.m.
Appellant then consented to the taking of a second statement to clear up the discrepancy between his statement and Pringle's. This second statement was taken in the same manner as the first. It was recorded on tape and later transcribed. The interrogation commenced at 9:00 p.m., and ended at 9:24 p.m. The statement shows that prior to questioning, appellant was advised of his Miranda rights and signed a waiver of rights form. After he was again advised of the charges, he acknowledged that he understood them, as well as his Miranda rights. He agreed to answer further questions, and acknowledged that he had been made no promises and had not been threatened or pressured. Appellant told Ward that some of his previous statement was incorrect, and Ward asked him to start at the beginning again and tell him "exactly what happened." In this statement, appellant stated that he and Pringle had carried out the two robberies and that he, not Pringle, had fired the shots in each incident. Appellant signed the transcribed statement and initialed each page.
Appellant testified that when the interrogation began, the officers wanted to know about the murders and robberies committed at the Majik Market and Seven-Eleven stores; that he initially denied knowing anything; that his right hand had been handcuffed to a chair; that Ward and Davis repeatedly struck him across the chest, bent his hand back, grabbed him by the throat, hit him on top of his head, kicked him on his knees, and stepped on his toes; that a picture of an electric chair was set in front of him, while the officers told him he was going to "burn"; that Davis put a pistol between his eyes and threatened to "take him out" and shoot him for trying to escape; and that he was called "nigger." He further testified that, after the threats and beatings, he made the two statements and that the statements were untrue. The implication of his testimony is that the statements attributed to him were not his at all, but were words "put in his mouth" by the officers. He stated that both statements were fabrications, and when asked how he came up with all the details, he implied that the officers told him what to say. He acknowledged that he knew the statements were being tape-recorded. Appellant admitted that he was advised of his Miranda rights, but stated that he did not understand them. He also stated that he signed a waiver of rights form, after first refusing, and that he asked for an attorney before making any statement, but that his request was denied and he was told by Ward and Davis that they would be his attorneys.
Appellant's girlfriend, Jessie Allen, testified that when she visited him in the interrogation room, his hair was "messed up," he was perspiring heavily, and he was handcuffed to a chair. She also testified that he complained of pain in his side and told her that he had been beaten; however, she stated that she saw no bruises, no lacerations, and nothing abnormal about him.
Bobby Marion, a police nurse in the city jail, identified medical records from the jail showing that appellant requested medical attention on September 3, 1981. The nurse was only asked to identify the records and was not questioned further. The records reflect only that, on September 3, 1981, appellant filled out a "Prison Request Card" requesting to see a doctor about getting "something for my side," stating, "I am sore all over." However, the records also disclose that he refused to fill out a medical request form when asked to do so, even when offered assistance, and that the incomplete medical form is in his jail file. Nothing further was offered in reference to his request to see a doctor.
Clarence Womack, a death-row inmate from the state penitentiary, testified that on February 6, 1981, he was interrogated in reference to his case by Officer Ward.
*552 He stated that he had been handcuffed to a chair; that no rights were explained to him; that he was refused an attorney even though he requested one; that the officers told him that they were his attorneys; that Ward and other officers slapped him and beat him repeatedly on top of his head and chest; that the beating went on all night; that the interrogation began at 6:00 p.m. and he signed a confession at 2:00 a.m.; and that the officers let him call his mother after he made a statement. He further testified that he presented this evidence during his trial, but that the court and jury did not believe him. He was convicted of the capital offense of murder in the first degree committed during the course of the robbery of a convenience store and was sentenced to death, and, according to him, his case is now on appeal.[4]
Troy Massey, an attorney, testified that he visited Clarence Womack in jail on February 8, 1981, at the request of Womack's mother, and observed "five or six bumps" on his head. Massey stated that he did not testify at Womack's trial.
Officers Ward and Davis denied striking, beating, or mistreating appellant in any way. They denied promising him anything or threatening him in any manner. Ward testified that appellant did not appear to be under the influence of drugs or alcohol. He denied using any physical force against appellant or anyone else, including Clarence Womack.
After the statements were taken, photographs were made of appellant by the officers, and three of the photographs were introduced into evidence.
Officer Rickey Moore testified that, after appellant had given the two statements, he and Ward went with appellant to Flomaton to look for the pistol used in the commission of the crimes, because appellant had stated that he had thrown the pistol in the woods near Flomaton and that he thought he could find it. Moore testified that, before they left Montgomery, appellant was read his Miranda rights and he signed a waiver of rights form; that after searching near Flomaton for some time, without success, the party returned to Montgomery; and that, on the way back, appellant told the officers that he would get them the pistol when they got back to Montgomery. Moore "thinks" appellant was advised again of his rights on the way back. Moore further testified that upon returning, appellant instructed the officers to get his girlfriend, Jessie Allen, which they did; that appellant told Ms. Allen to get the pistol; and that she went to an apartment near appellant's home and returned with the pistol. (Ballistics examinations later confirmed that the pistol was the one used in both robberies.)
Upon conclusion of the suppression hearing, the trial court determined that both the first and the second statement was voluntary and, when offered by the state, transcriptions of both statements and the tape recording of the second statement were admitted. Appellant's counsel had been furnished copies of the transcriptions and tape recordings of both statements prior to trial.
Appellant bases his contention that he exercised or attempted to exercise his right to remain silent principally on the testimony of Officer Davis at the first suppression hearing, which is as follows:
"Q. Officer Davis, let me ask you this. Is it a fact that when William [Bush] was first taken into custody and first taken in *553 to be interrogated, that he would not talk?
". . .
"A. No, sir. He did not want to talk. No, sir.
"Q. That is right. He did not want to talk and he would not sign a Rights Form. You had that situation, didn't you?
"A. Yes, sir. But he stated that he understood his rights."
We also note that Davis further testified, "But, after we talked with him further, he still wouldn't say nothing." Appellant, at no time, testified that he desired to remain silent or that he informed the officers that he desired to exercise his right to remain silent, even though he acknowledged that he understood his Miranda rights. Appellant speculates, in brief, that because of what Davis said, appellant must have indicated to the officers, in some way, his desire to remain silent.
The attorney general counterargues that consideration of Davis's testimony as a whole leads logically to the conclusion that Davis did not mean, in saying that appellant "did not want to talk," that appellant was expressing a desire or asserting his Miranda right to remain silent, but that it was merely a reference to appellant's refusal to admit participation in the crimes.
In Miranda v. Arizona, the Court held that, unless law enforcement officers give certain specified warnings prior to questioning a person in custody and follow certain specified procedures during the course of any subsequent interrogation, the state may not use in its case-in-chief any statement by the suspect, over the suspect's objection. 384 U.S. at 476-79, 86 S.Ct. at 1629, 1630; Christopher v. Florida, 824 F.2d 836, 839 (11th Cir.1987). Among the procedural safeguards established by the Miranda Court is the "right to cut off questioning." 384 U.S. at 474, 86 S.Ct. at 1627. If the suspect indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. Id. at 473-74, 86 S.Ct. at 1627; Martin v. Wainwright. When a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of "clarifying the equivocal request." Martin v. Wainwright, 770 F.2d at 924 (quoting Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir.1979)). The admissibility of a statement obtained after the person in custody has decided to remain silent depends, under Miranda, whether his right to cut off questioning was scrupulously honored. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed. 2d 313 (1975). Once informed of Miranda rights, an accused has the burden of indicating in some manner his wish to remain silent. Lightbourne v. Dugger, 829 F.2d 1012 (11th Cir.1987); United States v. Alegria, 721 F.2d 758 (11th Cir.1983).
We admit, at first glance at the quoted testimony, that it would appear that the right had been asserted; however, after a thorough review of the entire record, we consider the attorney general's argument to be persuasive. We find that the record supports the conclusion that appellant never invoked or asserted his right to remain silent after being given Miranda warnings, but rather indicates that, although appellant was willing to talk, he steadfastly denied any knowledge of or participation in the crimes until he finally decided to make a statement.
His testimony at the suppression hearings bolsters this conclusion. In both suppression hearings, appellant never claimed that he asserted his right to remain silent. Moreover, his counsel never raised this issue at any time during either trial, nor did the issue arise during the appeal of the first conviction. It is raised for the first time in this appeal. Apparently, nothing occurred prior to and during the trials to lead appellant's counsel to believe that the right to remain silent had been asserted. Finally, we have considered the following testimony of Davis: "Mr. Bush stated he wanted us to come back in the room. He wanted to talk to us. And at that time, myself and Corporal Ward went back in, and he told us about it."
For the foregoing reasons, we conclude that appellant failed to indicate a wish to *554 remain silent and, thus, that there was no violation of his Miranda rights in this regard.
Appellant also claims that his first and second statements were involuntary because, he argues, he was subjected by the officers to physical violence, threats of physical violence, and psychological coercion.
The oft-stated rule is that a confession is prima facie involuntary and inadmissible, and the state must show voluntariness and a Miranda predicate in order for it to be admitted. Thomas v. State, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976); Magwood v. State, 494 So.2d 124 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, ___ U.S. ___, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). Whether there was a waiver of the right to remain silent and the right to counsel and whether it was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of accused the totality of the circumstances. Magwood v. State, Thomas v. State; Chandler v. State, 426 So.2d 477 (Ala.Cr.App.1982) (citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). The question of whether a confession was voluntary is initially to be determined by the trial court. Ex parte Singleton, 465 So.2d 443 (Ala.1985). Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. Id. The finding of the trial court will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Magwood v. State; Marschke v. State, 450 So.2d 177 (Ala.Cr.App.1984). Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Chambers v. State, 455 So.2d 1008 (Ala.Cr.App.1984); Bennett v. State, 409 So.2d 936 (Ala.Cr.App.1981), cert. denied, 457 U.S. 1137, 102 S.Ct. 2968, 73 L.Ed.2d 1356 (1982). The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Ex parte Singleton; Ex parte McCary, [Ms. 86-1219, January 15, 1988] (Ala.1988). The fundamental requirements for voluntariness are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him. Martin v. Wainwright; Jurek v. Estelle, 623 F.2d 929 (5th Cir.1980) (en banc), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); Magwood v. State; Harris v. State, 420 So.2d 812 (Ala.Cr.App. 1982). We, therefore, look to the totality of the circumstances surrounding appellant's statements to determine whether the record supports the finding of the trial court and the admission of the statements into evidence.
Appellant asserts that the following aspects of the interrogation constitute psychological coercion: the length of the interrogation; the fact that he was handcuffed; the "techniques" used in the interrogation, which, as far as we can determine from the record, consisted of talking with him about his family, reading to him from a Bible, and letting his girlfriend visit him; and the "coercive" atmosphere in which the interrogation occurred. The record does not support an inference that the four-hour length of interrogation, with appellant handcuffed (by one hand) to a chair, rendered the confession involuntary or amounted to coercion. Moreover, regardless of the hour of the interrogation, there is nothing in the record to show that appellant was suffering from lack of sleep or was deprived of food, drink, or bathroom facilities. Appellant's appearance in the photographs taken of him immediately after the interrogation is normal and does not reflect fatigue, exhaustion, or mistreatment.
*555 The four-hour period was broken up by a private visit of approximately fifteen minutes from his girlfriend, during which time he was free of the handcuff. In addition, we are not persuaded that conversations about appellant's family and reading from the Bible constitute coercion. We also do not believe that the place of the interrogation, the presence of the officers, and the general atmosphere constitute coercion. We do not find that any of the tactics, standing alone or considered as a whole, constitutes coercion. Appellant was a mature 31-year-old man and was not inexperienced in the ways of crime and its detection. See Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953). We conclude that the trial court could properly find an absence of psychological coercion.
In addressing appellant's claim of physical violence and threats thereof, we note that the evidence of such was in sharp conflict. In resolving the conflict as it did, the trial court obviously did not believe appellant's claim of being beaten and threatened with violence, and it obviously was not persuaded by the testimony of the death row inmate who claimed that he also had been beaten by Ward during a previous unrelated interrogation. In reviewing the court's ruling, we are impressed with the following observations of the Supreme Court in Stein, 346 U.S. at 181-82, 73 S.Ct. at 1091:
"It is common courtroom knowledge that extortion of confessions by `third-degree' methods is charged falsely as well as denied falsely. The practical problem is to separate the true from the false. Primary, and in most cases, final responsibility for determining contested facts rests, and must rest, upon state trial and appellate courts.
"A jury and the trial judgeknowing local conditions close to the scene of events, hearing and observing the witnesses and partieshave the same undeniable advantages over any appellate tribunal in determining the charge of coercion of a confession as in determining the main charge of guilt of the crime. When the issue has been fairly tried and reviewed, and there is no indication that constitutional standards of judgment have been disregarded, we will accord to the state's own decision great and, in the absence of impeachment by conceded facts, decisive respect. [Citations omitted.]
". . .
"... Physical violence or threat of it by the custodian of a prisoner during detention serves no lawful purpose, invalidates confessions that otherwise would be convincing, and is universally condemned by the law. When present, there is no need to weigh or measure its effects on the will of the individual victim. The tendency of the innocent, as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain is so strong that judges long ago found it necessary to guard against miscarriages of justice by treating any confession made concurrently with torture or threat of brutality as too untrustworthy to be received as evidence of guilt."
In the instant case, the evidence offered by the state at the two suppression hearings consisted of the testimony of the two officers who conducted the interrogations, the two statements themselves, the tape recording of the second statement, and the post-interrogation photographs of appellant. This evidence disclosed that, prior to each interrogation, appellant was advised of the charges against him; was given proper Miranda warnings; acknowledged that he understood his Miranda rights; expressly waived those rights and agreed to make the statements or to talk about his participation in the crimes; acknowledged that no promises had been made to him and that he had not been threatened or pressured in any way; and acknowledged that he was not under the influence of alcohol. The evidence offered by the state was not materially inconsistent or inherently improbable, and the testimony of the officers was unshaken on cross-examination. Appellant's explanation, in his first statement, that he was giving the statement because it was obvious that the officers already knew *556 of his participation in the crimes and Ward's testimony that the second statement was taken for the purpose of clearing up differences in appellant's and Pringle's versions of the crimes are reasonable and plausible explanations and are sufficient to account for the confessions. The contents of the statements, as reflected by the transcripts of the first and second statements and a tape recording of the second, show a reasoned and logical discussion of appellant's participation in the crimes. The answers of appellant flow smoothly and logically; reflect a competent recitation of the facts; and give indication of spontaneity, cooperation, and voluntariness. In evaluating appellant's own words and voice on the tape recording, we find that appellant's contention that the statements are untrue and were merely the officers' words, which he was forced to speak because of beatings and threats, flies in the face of the calm, rational, spontaneous and detailed tape recording. His contention is incredible.
We find that, upon this evidence, the trial court could properly hold that the statements were not obtained by physical force or threats. Thus, we conclude that the confessions were not obtained by either physical force or threats thereof or by psychological coercion and that they were knowingly, voluntarily, and intelligently given after proper Miranda warnings and were, thus, admissible into evidence.
It is upon this holding that appellant's confessions were voluntary and, also, upon our additional finding that appellant's second statement was preceded by proper Miranda warnings and appellant's waiver thereof that we base an alternative disposition of appellant's contention that his confessions were inadmissible on the ground that he asserted his right to silence prior to the first confession.
Assuming, arguendo, that appellant did in fact assert his Miranda right to remain silent and that his assertion of that right was not scrupulously honored, resulting in a violation of Miranda and Mosely, even so, appellant's second confession would still be admissible under the rule stated by the Supreme Court in Oregon v. Elstad, and as applied in Martin v. Wainwright. Oregon v. Elstad involved a failure to give Miranda warnings, while Martin v. Wainwright and the instant case, we assume, involved the failure to honor the suspect's request to cut off questioning and remain silent; however, the court in Martin v. Wainwright held that the same reasoning as that of Oregon v. Elstad applies. The court in Martin v. Wainwright, 770 F.2d at 928, stated:
"In Elstad, the Court began by considering whether, and under what circumstances, the failure to administer Miranda warnings prior to a confession `taints,' under the `fruit of the poisonous tree' doctrine, a subsequent confession. The Court noted that the `fruit of the poisonous tree' doctrine applies only to constitutional violations. Id. at [306], 105 S.Ct. at 1291. The Miranda exclusionary rule, however, `sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of compelled testimony.' Id. at [307], 105 S.Ct. at 1292 (footnote omitted; emphasis in original). Miranda creates a `presumption of compulsion,' which, `though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted.' Id. The Court concluded:
"It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*557 "Id. at [309-311], 105 S.Ct. at 1293-94 (emphasis added). In other words, so long as the prior, unwarned confession satisfies the `due process voluntariness test,' id. at [309], 105 S.Ct. at 1293 (quoting Schulhofer, Confessions and the Court, 79 Mich.L.Rev. 865, 877 (1981)), the subsequent confession is not automatically rendered inadmissible under the `fruit of the poisonous tree' doctrine."
Applying this reasoning to our assumption that the first statement was inadmissible because appellant's Miranda right to remain silent was violated even though it met the "due process voluntariness test," we nevertheless find that the second statement was not automatically rendered inadmissible, since it was knowingly and voluntarily made after proper Miranda warnings. Under our assumed facts, the police violated the "technical" requirements of Miranda, but did not violate the Fifth Amendment itself. The absence of "actual coercion" in connection with the first interrogation renders the "fruit of the poisonous tree" doctrine inapplicable and does not automatically require the exclusion of the second statement. 770 F.2d at 928. The relevant inquiry is whether the first statement was also voluntarily made. Oregon v. Elstad, 470 U.S. at 312, 105 S.Ct. at 1294.
This we have already answered affirmatively. Having held that, under our alternative finding, the admission of the first statement was error due to the Miranda violation, we must determine whether its admission was harmless. The appropriate standard for determining whether this error was harmless is set forth in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See also Martin v. Wainwright. In order for an error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the admission of the confession did not contribute to the verdict obtained. 386 U.S. at 24, 87 S.Ct. at 828. "The state must show that the evidence that remains after the unlawful confession is excluded not only is sufficient to support the verdict, but overwhelmingly establishes the defendant's guilt beyond a reasonable doubt." Christopher v. Florida, 824 F.2d at 846.
After reviewing the record, we are convinced beyond a reasonable doubt that the erroneous admission of the first statement could not have contributed to appellant's conviction. The first statement was merely cumulative of the evidence contained in the second statement. In fact, the second statement included everything contained in the first statement and much more. It contained appellant's confession that he was the triggerman in the commission of both crimes instead of only one as he had asserted in his first statement. Martin v. Wainwright. See also Christopher v. Florida.
To summarize, we hold that appellant failed to assert his right to remain silent, but waived it; that his first and second statements were knowingly and voluntarily made with proper Miranda warnings and, thus, were admissible; and, assuming, arguendo, that he did exercise his right to remain silent and applying the rationale of Oregon v. Elstad and Martin v. Wainwright to the instant facts, that the second statement was properly admitted into evidence and the erroneous admission of the first statement was harmless error.

IV
Appellant contends that the trial court committed reversible error in instructing the jury concerning the voluntariness of his confessions. We agree.
During the guilt phase of the trial, appellant presented the trial court with a number of "Proposed Guilt-phase Instructions," among which was one pertaining to the responsibility of the jury in considering his confessions. Requested instruction number six is as follows:
"With regard to the alleged confession or statement of the defendant, you may consider all of the facts and circumstances surrounding the taking of the alleged confession or statement in determining the weight or credibility, if any, which *558 you give to the alleged confession or statement.
"In exercising your exclusive prerogative of determining the credibility of the evidence, or the weight to which the evidence is properly entitled, the jury shall consider the circumstances under which the alleged confession was obtained and the appliances by which it was supposedly elicited, including the situation and mutual relations of the parties.
"While the Court determines the voluntariness of a confession, the jury determines its weight or credibility and may disregard an alleged confession which is unworthy of belief or in which they entertain a reasonable doubt as to its truth."
The trial court did not give the instruction as requested, but gave its own, as follows:
"You have heard testimony in the case about a confession. The law says that the Court determines whether a confession is admitted into evidence. The Court determines whether a confession was voluntary or not, whether it was improperly induced and that kind of thing. The Court has ruled that the confession was voluntary. That is the Court's prerogative. The Court has listened and ruled on that in proceedings that took place prior to today. The Jury has the right to consider the confession in light of the circumstances surrounding it. Although I have ruled that it is voluntary, the Jury has the prerogative of evaluating what weight to give it. But when the Courtwhen I found it was not improperly induced, the Jury is not entitled to disregard the Court's admitting it. You are not to determine whether the Court's action in finding that it was voluntary is correct or not. But you are entitled to consider all of the circumstances surrounding the confession in determining the credibility of that evidence along with the credibility of any other evidence and determining what weight, if any, that you are going to give it."
Upon conclusion of the court's oral charge, and before the jury retired to deliberate, a side-bar discussion was had out of the hearing of the jury and the court reporter. We deduce from what occurred later that appellant raised some objection or question, in the unreported side-bar conference, in reference to the instruction pertaining to the confessions. Shortly after the side-bar conference, the jury commenced its deliberations. After the jury had been out approximately one hour, the court gave the jury further instructions on the matter of confessions, as follows:
"On this confession thing, the Court, like I told you, has ruled on the fact that the confession is before you. The Court has determined the voluntariness of the confession already. And while the Jury cannot disregard that, the Jury has the right to give no weight to it if they think that it is entitled to no credibility. That is all. Thank you."
Thereafter, the jury continued its deliberations, and defense counsel addressed the court, as follows:
"The Defendant, before they retired, noted to the Judge his objection to that portion of the Court's instruction where it advised the Jury concerning a prior determination of the voluntariness of the confession itself. [This obviously refers to what occurred during the unreported side-bar conference referred to above.] I do not recall the Judge's language at all and would only hope to paraphrase it by saying that the inference may have been given to them by the words of that instruction that they were to place some weight on the confession because they were not to disregard the Judge's predetermination of voluntariness, and specifically, in light of the facts of this case and the particular evidence and arguments made by Defense Counsel, I think that may have prejudiced the Defendant."
The trial court responded:
"Let the Record show that some of that came from Defendant's Requested Charge Number Six where the Defendant requests `While the Court determines the voluntariness of [a] confession, the Jury determines [its] weight [or] credibility.' The Court added from McElroy [referring *559 to C. Gamble, McElroy's Alabama Evidence § 200.02(10) (3d ed. 1977) ] the language that says of course the Jury is not permitted to determine whether the Judge's action was correct, but the Jury has the right to give no weight to the confession if they think it was entitled to no credibility. And the substance of the Court's charge was predicated on Defendant's Requested Charge Number Six and Section 200.04 [sic]."
Appellant objects to two aspects of the trial court's instructions: (1) informing the jury that the court had previously made a determination of voluntariness, thus implying that the jury, itself, could not decide whether the confessions were voluntary; and (2) informing the jury that this prior determination could not be disregarded. The attorney general contends that (1) because appellant did not object to the instructions on the grounds he raises on appeal, any error in the instructions is not a basis for reversal unless it was plain error; and (2) there was no plain error. As the attorney general points out, appellant did not object to the instructions that the judge had determined voluntariness and that this determination could not be disregarded; rather, his objection was that, from the instruction the jury could infer that it had to give the confession some weight. The attorney general further contends that the trial court's instructions did not constitute plain error because (1) they were consistent with the requested instructions submitted by appellant; (2) if there was error, it was invited; (3) the court's instructions were not plainly contrary to established law; and (4) appellant did not raise at trial the grounds now asserted on appeal.
"It is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and, therefore, admissible." Ex parte Singleton, 465 So.2d at 446. See also Clifton v. United States, 371 F.2d 354 (D.C.Cir.1966), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967); United States v. Inman, 352 F.2d 954 (4th Cir.1965). In Singleton, 465 So.2d at 446, the Alabama Supreme Court stated the rule applicable to the determination of the voluntariness of a confession and the weight to be given it, as follows:
"Correctly stated, whether a confession was voluntary rests initially with the trial court; once the trial judge makes the preliminary determination that the confession was voluntary, it then becomes admissible into evidence. Thereafter, the jury makes a determination of voluntariness as affecting the weight and credibility to be given the confession." (Emphasis in original.)
Further, the Singleton court quoted the rule from Duncan v. State, 278 Ala. 145, 165, 176 So.2d 840, 859 (1965), as follows:
"We are clear to the conclusion that whenever a motion is made for the question of the voluntariness of the confession to be determined outside the presence of the jury, the motion should be granted. In such a hearing, the trial judge sitting alone should make a determination upon a proper record of the issues of voluntariness.... If the confession is held voluntary and admitted, the jury's consideration of that confession and surrounding circumstances shall proceed in accordance with the `Orthodox' procedure, that is, the jury considers the voluntariness as affecting the weight or credibility of the confession."

465 So.2d 446-47. (Emphasis added in Singleton.)
In the instant case, it was improper for the trial court to disclose to the jury that it had made a preliminary determination of voluntariness of appellant's confessions. Although an instruction to this effect was requested by appellant, the trial court did not give the instruction requested, but gave one substantially different. The court instructed the jury that it had found that the confession "was not improperly induced" and that the jury could not disregard its admission. It further instructed the jury that the court had found the confession voluntary and that the jury could not disregard that finding. The court stated, "You are not to determine whether the Court's action in finding that it was voluntary is correct or not." In our opinion, the *560 instructions, taken as a whole, were incorrect as a matter of law, for they violated the rule of Singleton, set out above. They had the effect of taking from the jury its ultimate responsibility of determining the voluntariness of the confessions. Moreover, it can be reasonably concluded that the instructions left the implication that, based on the trial court's ruling that the confessions were voluntary and not improperly induced, the jury should give them some weight and credibility. It is also our opinion that appellant's objection to the instructions, although not as clear as it could have been, was sufficient to call the trial court's attention to the erroneous instructions and preserve the issue for review. We conclude that the instructions resulted in prejudicial error, which requires a reversal of this case.
Assuming, for the sake of argument, the correctness of the attorney general's position that we should apply only the "plain error" rule when considering this issue, in applying that rule to the questioned instructions, we find that the giving of the instructions constituted "plain error." There is no question that we must apply the "plain error" rule in capital cases to oral instructions to the jury. Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Under the "plain error" doctrine, as enunciated in A.R.A.P. 45A, this court is required to search the record in a death penalty case and notice any error of the trial court and to take appropriate action, "whenever such error has or probably has adversely affected the substantial right of the appellant," in the same manner as if defendant's counsel had preserved and raised such error for appellate review. Ex parte Johnson, 507 So.2d 1351 (Ala.1986); A.R.A.P. 45A. "Plain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also United States v. Frady, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir. 1981).
In the instant case, appellant was entitled, as a matter of right, to have the jury instructed that the jury had the responsibility to consider the voluntariness of the confessions as the voluntariness affected the weight or credibility of the confessions. The jury was not given those instructions, but was told that it was not to determine whether the court's action in finding the confession voluntary was correct or not. Thus, a substantial right of appellant was denied. The error is so obvious that failure to note it would seriously affect the fairness and integrity of the proceedings. We are compelled to conclude that the instructions adversely affected a substantial right of appellant, which probably resulted in an unfair, prejudicial impact on the jury's deliberations. They had the effect of erroneously relieving the jury of determining the voluntariness of the confessions and created a real possibility that the jury gave more weight to the confessions than it otherwise would have, had it been properly charged. United States v. Garza, 807 F.2d 394 (5th Cir.1986); Ex parte Johnson; Ex parte Harrell.

V
We have considered all the other issues raised by appellant and choose not to address them in this opinion, since it is possible that some of the matters objected to will not arise in a new trial, or if they do, will arise out of different factual situations, and others involve settled principles of law which we deem unnecessary to address at this time.
We note, however, that the trial court in the sentencing phase of the trial found as an aggravating circumstance that appellant had been convicted of violating the Federal Firearms Act for possessing a sawed-off shotgun. A conviction for this offense would not constitute an aggravating circumstance under § 13A-5-49 and should not have been considered as such by the court. The trial court may not find and consider any aggravating circumstance other than the eight specified in the statute. Tomlin v. State, 443 So.2d 47 (Ala.Cr.App. 1979), aff'd, 443 So.2d 59 (Ala. 1983), cert. denied, 456 U.S. 954, 104 S.Ct. 2160, 80 *561 L.Ed.2d 545 (1984). The capital sentencing statutes should be strictly adherred to. Id. Further, although we do not address those arguments of the prosecutor that appellant has questioned, we point out that jury summations should be confined within proper bounds. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury, should not express personal opinions, and should argue only the facts in evidence or those reasonable inferences which may be drawn from such facts.
Due to the erroneous jury instructions pertaining to the confessions, hereinbefore discussed, we reverse the judgment and remand this case for a new trial.
REVERSED AND REMANDED.
All Judges concur.

ON APPLICATION FOR REHEARING
PATTERSON, Judge.
In its application for rehearing, the state, pursuant to A.R.A.P. 39(k), requests that we amend our opinion and find certain additional facts. It also requests that we withdraw section IV of our opinion and affirm appellant's conviction. The state, in its application for rehearing, essentially argues the same issue that we addressed in section IV and decided adversely to it in our opinion. We, therefore, overrule its application for rehearing. We also deny the state's Rule 39(k) motion.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED; RULE 39(k) MOTION DENIED.
All Judges concur.
NOTES
[1] We note that each count contained a miscitation of the statute under which appellant was indicted. Each count alleged a violation of § 13A-5-31(a)(2), which was repealed effective July 1, 1981, and was replaced by § 13A-5-40(a)(2) of the 1981 capital punishment statute. The Alabama Supreme Court, applying A.R.A.P. 39(k), noticed this defect on the previous appeal of this case, finding that the citation of § 13A-5-31(a)(2) was error because the crime occurred on July 26, 1981, 25 days after the effective date of the 1981 statute, and that § 13A-5-40(a)(2) was the applicable code section. However, the Court held that the error was not of such legal significance as to require reversal; appellant was not prejudiced by the miscitation; and the indictment adequately described the offense under the 1981 statute. The court further found that the record affirmatively showed that the trial judge and counsel for the respective parties, well before the trial date, acknowledged that the trial and the subsequent sentencing procedure would be governed by the 1981 statute. Bush v. State, 431 So.2d at 564-65.
[2] Edward Lewis Pringle was convicted of capital murder February 17, 1982, in Case No. 81-1350 in the Circuit Court of Montgomery County, Alabama, and was sentenced to life imprisonment without parole on March 9, 1982. Case No. 81-1350 involved the murder of Andy Adams during the robbery of the Seven-Eleven store on Narrow Lane Road in Montgomery, Alabama. The case was not appealed. He was convicted of attempted murder in Case No. 81-1351, and sentenced to life imprisonment without parole as a habitual offender, May 6, 1982. Case No. 81-1351 involved the murder of Larry Dominguez and the shooting of Tony Holmes during the robbery of the Majik Market store on Carter Hill Road in Montgomery, Alabama. This case was appealed to this court, and we affirmed without opinion, March 1, 1983.
[3] The Court in Welsh v. Wisconsin, 466 U.S. 740, 751-52, 104 S.Ct. 2091, 2098, 2099, 80 L.Ed.2d 732 (1984), characterized Dorman as "a leading federal case defining exigent circumstances," but declined to express approval of "all the factors included in the standard."
[4] Womack's conviction for the capital offense and his sentence of death were affirmed by this court on February 1, 1983, 435 So.2d 754 (Ala. Cr.App.1983), and affirmed by our supreme court on July 8, 1983, Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). Both state courts addressed the voluntariness of Womack's confession and found that it was properly admitted into evidence. The supreme court stated:

"The facts surrounding the statement and its execution were exhaustively explored at the trial, and there is substantial evidence that the confession was voluntary, understood by the Petitioner, and that the written version was knowingly signed by him. Thus, no error was committed by the trial court by allowing it into evidence."