[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1151 
Richard Eugene Gaddy, currently an inmate on death row at Holman Penitentiary, appeals the circuit court's denial of his petition for postconviction relief filed pursuant to Rule 32, Ala.R.Crim.P.
In 1991, Gaddy was convicted of capital murder for murdering James Caldwell during the course of a robbery, see §13A-5-40(a)(2), Ala. Code 1975. The jury, by a vote of 10 to 2, recommended that Gaddy be sentenced to death. The circuit court accepted the jury's recommendation and sentenced Gaddy to death. Gaddy's conviction and sentence were affirmed on direct appeal. See Gaddy v. State, 698 So.2d 1100 (Ala.Crim.App. 1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032,118 S.Ct. 634, 139 L.Ed.2d 613 (1997). This Court issued the certificate of judgment on July 11, 1997. See Rule 41, Ala.R.App.P.
In November 1998, Gaddy filed a Rule 32 petition in the Jefferson Circuit Court attacking his conviction and death sentence. In February 2002, Gaddy filed an amended petition. After an evidentiary hearing the circuit court denied the petition. This appeal followed.
In its order fixing Gaddy's sentence at death, the circuit court set out the following facts surrounding Caldwell's murder:
 "James A. Caldwell was fifty years of age at the time of his death, lived alone in the East Lake part of Birmingham, Jefferson County, [and] was employed as a math teacher at Huffman High School.
 "Co-worker Robert McCary last saw deceased alive on Friday, December 8, 1989.
 "On the following Wednesday, McCary and the school principal, Robert Simmons, became suspicious about Mr. Caldwell's absence from work and went to his apartment having called the Birmingham Police Department for an officer to meet them at the home.
 "Mr. Caldwell was observed [through] the mail slot in the door lying prostrate in a pool of blood behind the door. *Page 1152 
 "Mr. McCary, coach and driver's education teacher at Huffman High School, and Robert Simmons, the principal, gave their testimony [regarding] their observations at the Caldwell residence.
 "Dr. Gary Simmons, forensic pathologist, described multiple incised wounds (longer than deep) and stab wounds to the person of the deceased, said wounds being depicted as being about the deceased's head, neck, left ear, chest, abdomen and palm of hand. [He also described several abrasions.]
 "Dr. Simmons detailed nineteen incised and/or stab wounds as well as detailing evidence of `severe strangulation,' adduced from `pinpoint' hemorrhaging in the eyes. Dr. Simmons stated that strangulation was not the cause of death, that the decedent was alive when he was being stabbed as evidenced by the hemorrhaging from the wounds.
 "According to Dr. Simmons, toxicology revealed no evidence of drug or alcohol ingestion by the deceased, serology testing revealed no evidence of semen in any body cavity.
 "Larry Chapman, deputy sheriff in Saluda [County], South Carolina, stopped [Gaddy] and two other males in the deceased's automobile on December 13, 1989, in Saluda County, South Carolina. [Gaddy] was seated in the back-seat of the automobile.
 "The jurors were not allowed to hear that a BOLO (be on the lookout) had been issued [regarding] the vehicle because of two robberies committed in South Carolina, [Gaddy] being videoed in the commission of one of the robberies. Prior to being brought to Alabama for the trial of the capital murder of Mr. Caldwell [Gaddy] entered guilty pleas to two robbery offenses in South Carolina — the guilty pleas being admitted on cross-examination of [Gaddy] in the guilt phase for purposes of impeachment.
 "Larry Chapman and Lt. George Booth with the South Carolina State Police testified about some of their activities with [Gaddy] — testifying from a `sanitized' or redacted inculpatory statement.
 "`[Gaddy's] statement[s], post Miranda and deemed voluntary by the undersigned, given to Lt. Booth, comprised the main thrust of the state's case against defendant Gaddy. The statements follow, absent the Miranda preamble.
 "December 14, 1989
 "`In the last of October when I left Augusta, Georgia hitchhiking, I was headed nowhere particular, I headed for Atlanta, Georgia. I knew it was big enough to make money and to roll people. I stayed in Atlanta, under a bridge one night. I couldn't find any-body who had anything to roll in Atlanta. So I hitchhiked on down 1-20 to Birmingham. I slept outside and I got sick. I went to the Mission when I got to Alabama. I got up with James Sanders. He pulled up and asked me if I wanted to work. I went to work with him at the carnival. I worked one day. That was October 31, 1989. I worked at the race track with his wife. She would get me a visitor's pass. I also helped them around the house. On the 8th of December, James and his wife asked me to leave. I left on Friday and I slept in the park. On Saturday the 9th of December, 1989, I fooled around, I just bought time until dark until I could find somebody to roll and have the cover of night. I got up on 59 or 1-20 hitchhiking, a man, a white man, stopped and I got in the car. He asked me if I wanted to get something *Page 1153 
to eat. I knew then that he was gay. I knew then that it would be easy to get to his house to roll him and to rob him. This was about 6:00 to 6:30. He told me his name was Jim. We went to his house. He turned on the TV and I was cold and I sat by the heater. About 7:30 he started acting like he was going to freak out or something. He was laving on the couch and I was sitting on the couch. His bed was right across from the couch. He was wearing a white T-shirt, black or navy pants, I was wearing blue jeans and insulated coveralls and a red, white and blue jersey shirt and tennis shoes that night. I got up and I moved toward him and reached behind my back for the knife that I had concealed. It was a paring type knife with a 4½ to 5 inch blade. I had filed the blade to a double edge knife and made it a combat point. He grabbed my hand as soon as I came around with the knife. He was lying down and started to sit up. I moved with an upward thrust, stabbing him in the chest. He grabbed my hand and I stabbed again, but I am not sure I stabbed him that time. Jim got the knife and we were fighting. He came up off the couch and I got around behind him in the fight. Jim said, `Just leave.' As I tried to get the knife from him he got to the door and got it unlocked but not opened. During that struggle from the bed to the couch to the door, my right hand was cut between the thumb and index finger. My left hand got a puncture in the palm. I reached in my back pocket and got a piece of white nylon rope a quarter inch thick about 40 inches long. I wrapped it around Jim's neck. Jim got the knife between the rope and his neck and cut the rope [in two]. I had some of the rope wrapped around my hand. I let some of it unwrap from my left hand, reached around and grabbed the loose end with my right hand pulled it back around Jim's neck and choked him until he was either dead or passed out. I took the knife and stabbed him three more times in the throat below the Adam's Apple. I let him lay for awhile and searched the rest of the house. The house was junkie. I stole old coins, collections, paper money, loose change, gold and silver rings and a pair of binoculars. I went back over to Jim and I took a small gold ring off his right pinky finger, a nine diamond cluster ring. Then I got his wallet, car keys and money about $60.00 in his pocket and later I found more cash in the wallet and money hid in the old paper money collection. I put it all in a sack, a plastic sack. I turned out all the lights in the house. Before I turned off the lights, I washed the blood off of my hands. When I went out of the house I locked the front door with the key so no one could easily find him. I went out to the car and got in and drove off. I went back and picked up my clothes where, I had them stashed. I headed for Augusta, Georgia. When I crossed into Georgia on 1-20 I rolled the window down on the passenger's side and threw the knife out while I [was] still moving. When I got to Atlanta, Georgia, I stopped and changed my clothes, I put the clothes I took off in a trash bag and put them back into [the] car. Every 10 to 15 miles I threw out pieces of clothing out the car until they were gone. I was about 5 miles out of Atlanta and threw clothing out the passenger window of the car. When I got back to Bath, I rented a motel room so I could go through the stuff to see what I *Page 1154 
 had, I separated it into what I thought was valuable and what was not valuable. On Monday I started selling some of it. Monday, I went over to a friend's house, Tony Yarborough. I asked him if he would take some rings and money collection to the pawn shop to sell it. He said he could try to sell the rings at the pawn shop. He didn't know anything about the coins but he would try some coin shops. Tony did not know anything about the car being stolen or the murder. We went to the Gordon Military Pawn Shop on Broad Street. Tony and I went in and had him look at all the rings which was about 25 or 30. Some had settings and some were just settings with the setting removed. Some of them were silver. The man said they did not buy silver. There were only 2 rings he wanted. By this time I had read the papers in the car and I knew the man's name was James Caldwell. One of the rings that the man bought at the pawn shop was the ring I took off of Jim's pinky finger. A nine diamond cluster ring. The other was a solid 10K gold ring with the setting removed. The rest of the rings I sold for $5.00 or $10.00 or traded for Crack on Hwy 278 in Aiken County, I believe. I traded the binoculars for crack rock. We took paper money to a coin shop in Augusta and sold some of it for $60.00. I still had some paper money and the coins and stamp collection when I was arrested in Saluda County, December 13, 1989.'" (Trial record, p. 1005-10.)
 Standard of Review
Gaddy appeals the denial of his Rule 32, Ala.R.Crim.P., petition attacking his capital-murder conviction and death sentence. We apply an abuse-of-discretion standard when reviewing a circuit court's ruling on a postconviction petition. See Reed v.State, 748 So.2d 231 (Ala.Crim.App. 1999).
When this Court examined Gaddy's direct appeal we applied a plainerror standard of review. However:
 "`"[T]he plain error rule does not apply to Rule 32 proceedings, even if the case involves the death sentence." Thompson v. State, 615 So.2d 129
(Ala.Cr.App. 1992).' Cade v. State, 629 So.2d 38, 41 (Ala.Crim.App. 1993), cert. denied, [511] U.S. [1046], 114 S.Ct. 1579, 128 L.Ed.2d 221 (1994).
 "In addition, `[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.' State v. Tarver, 629 So.2d 14, 19 (Ala.Crim.App. 1993)."
Brownlee v. State, 666 So.2d 91, 93
(Ala.Crim.App. 1995).
Last, the Rule 32 proceedings were initiated by Gaddy. According to Rule 32.3, Ala.R.Crim.P., Gaddy has the "burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief."
 I.
Gaddy argues that he is entitled to a new trial because his two court-appointed attorneys did not have five years of experience in the active practice of criminal law required by §13A-5-54, Ala. Code 1975. Gaddy also argued in his Rule 32 petition that his counsel's performance was ineffective because they lacked the statutory experience required in § 13A-5-54, Ala. Code 1975.[1] *Page 1155 
To the extent that Gaddy argues that he is entitled to a new trial because his attorneys failed to meet the statutory requirements contained in § 13A-5-54, Ala. Code 1975, his argument is precluded because it could have been raised at trial or on appeal. See Rule 32.2(a)(3) and (a)(5), Ala. R.Crim.P.
Gaddy urges this Court to adopt an across-the-board rule that if counsel fails to meet the statutory requirements of §13A-5-54, counsel's performance is per se ineffective.
The Florida Supreme Court has adopted standards for attorneys who represent capital defendants. See Rule 3.112, Fla.R.Crim.P. The Committee Comments to this Rule state, in part:
 "These standards are not intended to establish any independent legal rights. For example, the failure to appoint co-counsel, standing alone, has not been recognized as a ground for relief from a conviction or sentence. See Ferrell v. State, 653 So.2d 367
(Fla. 1995); Lowe v. State, 650 So.2d 969
(Fla. 1994); Armstrong v. State, 642 So.2d 730
(Fla. 1994). Rather these cases stand for the proposition that a showing of inadequacy of representation in the particular case is required. See Strickland v. Washington, 466 U.S. 668 (1984). These rulings are not affected by the adoption of these standards. Any claims of ineffective assistance of counsel will be controlled by Strickland."
We cited this Rule and its comments with approval in McGowanv. State, [Ms. CR-95-1775, December 12, 2003] ___ So.2d ___ (Ala.Crim.App. 2003).
Other states have also held that a lack of experience on the part of an attorney is not per se ineffective but must be evaluated under Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As the Illinois Supreme Court stated in People v. Pecoraro, 175 Ill.2d 294, 320-21, 222 Ill.Dec. 341, 354, 677 N.E.2d 875, 888 (1997):
 "At the outset we consider defendant's general claim that his sixth amendment right to effective assistance of counsel was violated because trial counsel was unqualified to represent him due to lack of training and experience. Defendant observes that trial counsel had previously conducted only four jury trials, had no staff or co-counsel to rely upon, and lacked specific training in the defense of capital cases. Defendant also notes that his attorney represented him for a total fee of $200. According to defendant, his attorney should have requested that the court appoint co-counsel and provide funds for investigative assistance, mitigation experts and other experts as needed. As noted in People v. Lear, 175 Ill.2d 262, 274, 222 Ill.Dec. 361, 677 N.E.2d 895 (February 6, 1997), `[Waving a counsel with limited resources and limited experience is not a circumstance which this court has held to constitute per se ineffective assistance of counsel.' In Lear counsel had only been out of law school for two years when appointed to represent the defendant, counsel had never tried a capital or homicide case before, counsel had received no formal training in defense of capital cases, counsel's office employed no investigators or other attorneys, the only assistance counsel received was from another attorney who performed 60 hours of legal research, and counsel had numerous other pending cases. As in Lear, counsel's alleged inexperience and lack of resources in the present case would be *Page 1156 
insufficient in itself to give rise to a sixth amendment violation. Rather, under Strickland's two-part test, defendant must establish specific errors by counsel and resultant prejudice."
Aragon v. State, 114 Idaho 758, 761, 760 P.2d 1174, 1177
(1988)("The dispositive facts upon which an ineffective assistance claim succeeds or fails centers on counsel's performance, not the level of his or her experience.").
In this case, the circuit court appointed William K. DelGrosso to represent Gaddy in June 1990. DelGrosso had been admitted to practice law in September 1985. DelGrosso testified at the Rule 32 hearing that before he obtained his license to practice law he was a police officer. He further stated that before Gaddy's trial he had assisted other attorneys in at least eight capital-murder cases and in the one case where he handled the penalty-phase on his own the defendant was sentenced to life imprisonment without parole. J. Derrel McBrayer was licensed to practice law in 1983 and was appointed as cocounsel in December 1990. McBrayer had been licensed to practice law for more than five years but his law practice had not been devoted to criminal cases.
We addressed a similar claim in McGowan, supra, and found:
 "In reviewing the trial court's appointment of Garrett and Hines [neither of whom had engaged in the active practice of criminal law], we find that the intent of § 13A-5-54[, Ala. Code 1975,] was followed. While the technical requirement of the statute may not have been met, the obvious objective and intent of the statute — effective counsel for an indigent capital litigant — was fulfilled,"___ So.2d at ___.
For the above reasons, we decline to adopt an across-the-board rule that if an attorney fails to meet all of the technical requirements of § 13A-5-54, Ala. Code 1975, his performance is per se ineffective. A petitioner alleging a claim of ineffective assistance of counsel must comply with the two-pronged test articulated by the United States Supreme Court inStrickland.
 II.
Gaddy argues that his trial counsel's performance was deficient both at the guilt and the penalty phase of his capital trial.
Claims of ineffective assistance of counsel are evaluated under the two-pronged standard announced by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must show (1) that counsel's performance was deficient and (2) that he was prejudiced as a result of the deficient performance.
 "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered *Page 1157 
sound trial strategy.' See Michel v. Louisiana, [350 U.S. 91], at 101 [(1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."
466 U.S. at 689, 104 S.Ct. 2052. As the United States Supreme Court further stated:
 "[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."
466 U.S. at 690-91, 104 S.Ct. 2052.
 Finally,
 "[t]he purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992)('We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize that `[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.' Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled.' Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).
 ". . . .
 "Because the reasonableness of counsel's acts (including what investigations are reasonable) depends `critically' upon' information supplied by the [petitioner]' or `the [petitionee]'s own statements or actions,' evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims. Strickland, 104 S.Ct. at 2066. `[An] inquiry into counsel's conversations with the [petitioner] may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.' Id. ('[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.')."
Chandler v. United States, 218 F.3d 1305, 1313-19 (11th Cir.2000) (footnotes omitted).
 1.
Gaddy argues that "counsel failed to suppress Mr. Gaddy's statement." (Gaddy's brief at page 65.) Specifically, he asserts that the statements were obtained through coercion and intimidation and were given when Gaddy was under the influence of drugs and alcohol; therefore, *Page 1158 
he argues, they should have been excluded from the jury's consideration.
In regard to this claim, the majority of this Court's opinion on direct appeal was devoted to addressing Gaddy's claims concerning the admission of his confession. Gaddy,698 So.2d at 1112-18. We stated, in part:
 "This testimony by Lieutenant [George] Booth [a South Carolina State police officer] was sufficient to meet the State's burden of proving that the statement was given without improper inducement by threat or promise. Moreover, the State introduced documentary evidence, including preambles to the appellant's statements that were signed by him and that acknowledged that he was not being threatened, coerced, nor promised anything in order to secure the statement, and that it was being voluntarily made. This was sufficient to meet the State's burden of proof."
Gaddy, 698 So.2d at 1115. The Supreme Court likewise concluded that Gaddy's confession was voluntary. Ex parteGaddy, 698 So.2d at 1151-56. Accordingly, as to this issue Gaddy cannot establish prejudice under Strickland.
Gaddy also argues that counsel failed to investigate the circumstances surrounding Gaddy's confession and failed to adequately perform at the suppression hearing. The only reference to this in Gaddy's amended petition is the following comment:
 "Trial counsel failed to adequately investigate the circumstances surrounding Mr. Gaddy's statement made to South Carolina officials. Trial counsel failed to interview witnesses involved with Mr. Gaddy's statement, including several South Carolina police officers, members of the Birmingham Police Department and the court reporter who took his statements. Counsel neither sought nor obtained available documentation in South Carolina regarding Mr. Gaddy's arrest and statement."
(C.R. 631.)[2]
At the Rule 32 evidentiary hearing DelGrosso testified as follows:
 "Q [Petitioner's counsel]: Going back to Mr. Gaddy's confession, did you decide, prior to trial, to attempt to get the confession suppressed?
 "A [DelGrosso]: I did.
 "Q: That confession was taken by police officers from Saluda County, South Carolina?
 "A: Correct.
 "Q: Did you request or subpoena Saluda County police files prior to making your motion to suppress that confession?
 "A: The best of my recollection, we, by we, I'm talking about Deputy District Attorney, I, and the Judge made, if not one, more than one telephone call to South Carolina, and the Judge directed that certain materials be produced, but I don't remember exactly what it was. It related to the case, but I remember I remember him making that request to those authorities, yes."
(R. 46.) Gaddy failed to meet his burden of proof in regard to this claim; therefore, relief was correctly denied. *Page 1159 
 2.
Gaddy further argues that counsel was ineffective because they failed to object to the erroneous jury instructions concerning the voluntariness of Gaddy's confession.
The trial court gave the following instruction on Gaddy's confession:
 "With regard to the statements, folks, as reflected in the exhibit numbers the court gave you, consider all of the facts and circumstances surrounding the taking of the alleged confession or statement in determining the weight or credibility which you give to the statement. In exercising your exclusive prerogative of determining credibility of the evidence or the weight to which it is properly entitled, you may consider the circumstances under which the statement was obtained, including the situation and mutual relation of the parties. While I determine the voluntariness of the statement and thus you were allowed to hear it, the jury determines the weight or credibility and may disregard the defendant's statements which you deem to be unworthy of belief or in which you entertain a reasonable doubt as to its truth."
(Trial record, p. 710.)
The Alabama Supreme Court, when addressing this issue, stated the following:
 "However, because Gaddy did not object to this instruction, we review it only for plain error. Rule 39(k), Ala. R.App.P. As support for his argument that the error constituted plain error, Gaddy cites Bush v. State, [523 So.2d 538 (Ala.Crim.App. 1988)]. In Bush, the Court of Criminal Appeals, with an opinion by Judge Patterson, reversed a conviction in a capital case, based upon a violation of the rule stated in [Ex parte] Singleton, [465 So.2d 443
(Ala. 1985)]. The circuit judge in that case instructed the jury as follows:
 "`You have heard testimony in the case about a confession. The law says that the Court determines whether a confession is admitted into evidence. The Court determines whether a confession was voluntary or not, whether it was improperly induced and that kind of thing. The Court has ruled that the confession was voluntary. That is the Court's prerogative. The Court has listened and ruled on that in proceedings that took place prior to today. The Jury has the right to consider the confession in light of the circumstances surrounding it. Although I have ruled that it is voluntary, the Jury has the prerogative of evaluating what weight to give it. But when the Court — when I found it was not improperly induced, the Jury is not entitled to disregard the Court's admitting it. You are not to determine whether the Court's action in finding that it was voluntary is correct or not. But you are entitled to consider all of the circumstances surrounding the confession in determining the credibility of that evidence along with the credibility of any other evidence and determining what weight, if any, that you are going to give it.'
"523 So.2d at 558 (emphasis added). The Court of Criminal Appeals held that the error caused by the erroneous instruction rose to the level of plain error and thus required a new trial.
"We agree with the State that the instruction given inBush and the one given in this case are distinguishable. Clearly, as Judge Patterson wrote, the circuit judge inBush committed plain error by specifically charging the jury that it was `not entitled to disregard the Court's admitting [the confession].' Id. at 558. Thus, the judge inBush *Page 1160 
 through his instruction, took the issue of voluntariness of the confession away from the jury.
 "This case is unlike Bush, because in this case the judge simply charged the jury that he had made an initial determination that the confession was voluntary. Although the judge erred in doing so, he also specifically told the jury that it was to determine the issue of `weight or credibility' of the confession and that it was free to `disregard the defendant's statements which you deem to be unworthy of belief or in which you entertain a reasonable doubt as to its truth.' As this Court and the Court of Criminal Appeals have held, if the circuit court makes it clear in its instruction that the jury was `to ultimately determine whether the confession was voluntary,' then the error in instructing the jury that the court had already made a determination of voluntariness may be found to be harmless. Singleton, supra, at 446; see Aultman [v. State, 621 So.2d 353] at 355
[(Ala.Crim.App. 1992)], and Clark [v. State, 621 So.2d 309] at 324 [(Ala.Crim.App. 1992)]. The jury was informed that it could disregard Gaddy's confession entirely if it decided to give no weight to the confession or if it found the State's witnesses to be unworthy of belief."
Ex `parte Gaddy, 698 So.2d at 1157-58 (footnote omitted). In Gaddy, the Supreme Court specifically held that although the jury instruction was erroneous, it was harmless error. Harmless error does not rise to the level of the prejudice required to satisfy the Strickland test. As a Florida Court of Appeals aptly explained in Johnson v. State,855 So.2d 1157 (Fla.Dist.Ct.App. 2003):
 "If the harmless error test . . . has been satisfied, then it follows that there can be no prejudice under Strickland v.
Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
(1984). This is because of the fundamental difference between the harmless error test that is applied on direct appeal and the prejudice prong of Strickland. As the first district has explained:
 "`Significantly, the test for prejudicial error in conjunction with a direct appeal is very different from the test for prejudice in conjunction with a collateral claim of ineffective assistance. There are different tests because, once a conviction becomes final, a presumption of finality attaches to the conviction. Thus, as Goodwin [v. State, 751 So.2d 537, 546
(Fla. 1999)] explains, the test for prejudice on direct appeal is the harmless error test of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), under which trial court error will result in reversal unless the prosecution can prove `beyond a reasonable doubt' that the error did not contribute to the verdict obtained. Conversely, however, as explained in Strickland, prejudice may be found in a collateral proceeding in which ineffective assistance of counsel is claimed only upon a showing by the defendant that there is a `reasonable probability' that counsel's deficient performance affected the outcome of the proceeding.'"
855 So.2d at 1159, quoting in part Sanders v. State,847 So.2d 504, 506 (Fla.Dist.Ct.App. 2003). See also Commonwealthv. Howard, 538 Pa. 86, 645 A.2d 1300 (1994). Because the Supreme Court specifically held that the erroneous jury instruction was harmless error, Gaddy cannot show prejudice underStrickland. Relief was correctly denied on this claim.
Gaddy further argues that counsel was ineffective for failing to object to other *Page 1161 
alleged erroneous jury instructions. Specifically, he argues that the instruction on reasonable doubt was erroneous and that the trial court should have instructed the jury on the lesser-included offense of intentional murder.
On direct appeal, we specifically held that the jury instructions on reasonable doubt were not erroneous. We stated:
 "The Supreme Court concluded that, despite the use in the reasonable doubt instructions of the challenged terminology, when the entire charge was viewed, the instructions were proper because the trial court informed the jury that its verdict had to be based upon the evidence."
Gaddy, 698 So.2d at 1139. Accordingly, we cannot say that counsel was ineffective for failing to object to the instructions on reasonable doubt.
Moreover, we also held that the trial court did not err in failing to instruct the jury on the lesser offense of intentional murder. We stated:
 "In the present case, the trial court did not charge the jury as to intentional murder as a lesser included offense, because the evidence presented did not support a rational basis for a conviction of intentional murder. The State's evidence indicated that the appellant intended to rob the victim when he accompanied him to his home. He then engaged in a struggle with the victim in order to rob him and, using a knife that he had brought to the scene, the appellant murdered the victim and escaped with some of his property. The appellant's theory of the case, as established by his trial testimony, was that he did not intend to kill the victim, but rather that he acted in self-defense against the victim's assaults. There is no theory which does not include a robbery in connection with the death; therefore, if there was an intentional murder, then the offense was capital murder during a robbery."
Gaddy, 698 So.2d at 1135. Gaddy failed to satisfy theStrickland test, and relief was correctly denied on this claim.
 3.
Gaddy argues that counsel was in-effective for failing to investigate and to challenge the State's case against him.
The Rule 32 court made the following findings of fact on this claim:
 "In this claim, Petitioner alleged that his counsel unreasonably failed to undertake an independent and adequate investigation of this case, and instead relied entirely on the State's version of events. The record of Gaddy's trial strongly refutes this claim. As noted in this Court's order at the conclusion of Gaddy's trial, defense counsel presented the testimony of Katrina Ward, who was called to corroborate Gaddy's story that the victim was a homosexual who engaged in numerous homosexual activities. Counsel undertook an investigative effort to locate this witness.
 "The record of Gaddy's trial, along with the testimony of William DelGrosso strongly refutes the allegations in the petition that trial counsel sat idly by doing nothing in the defense of then-client. Furthermore, the allegations in the petition, as well as the evidence presented by the petitioner during the evidentiary hearing, fall far short of establishing any type of prejudice.
 "Not one single piece of evidence was offered at the evidentiary hearing that could have altered the outcome of the guilt phase of Gaddy's trial. Gaddy's defense rested entirely on his testimony, which differed from his statement to law enforcement officials. The testimony of *Page 1162 
DelGrosso establishes that the defense was shaped during pretrial preparation when Gaddy gave his altered version of events. This led trial counsel to seek out and find Katrina Ward to make Gaddy's altered version seem more plausible, as well as to call Sgt. Duncan in the Birmingham Police Department to establish that Gaddy was given no further opportunities to amend his statement once he was brought to Alabama from South Carolina. These witnesses were a valiant attempt by trial counsel to give Gaddy's new story credibility with the jury.
 "There is only one surviving witness as to what transpired at the victim's residence on the night of the murder. Petitioner was the only person who could shed light on the events of that evening. Those facts were scattered throughout numerous versions of events given to law enforcement, mental health professionals, his attorneys, and the jury. The jury had to determine which version of events was true. Trial counsel had the difficult task of attempting to persuade the jury that Gaddy's trial version was more reliable than his statements to law enforcement. That they failed to do so does not make them ineffective attorneys.
 "There was no evidence offered at the evidentiary hearing that would cause this Court to believe someone else killed the victim. There was no evidence offered that would cause this Court to believe that Gaddy's `self-defense' story would have been more credible had his attorneys done something more. Trial counsel did an excellent job with the limited evidence available and the damning facts of this case."
(C.R. 41-43.)
The record supports the circuit court's findings. The attorney-fee declarations for both DelGrosso and McBrayer were introduced at the Rule 32 hearing. DelGrosso's fee declaration shows that he billed for 53 in-court hours and for 125 out-of-court hours. McBrayer billed for 44 in-court hours and 103 out-of-court hours. The fee declarations also show that counsel met with Gaddy on numerous occasions and conducted an extensive investigation to locate Katrina Ward, a witness who could corroborate Gaddy's statement that he had previously been to Birmingham.
Attorney McBrayer prepared a history of Gaddy's life. DelGrosso said that he tried to speak with Gaddy's mother but that she was uncooperative. DelGrosso also spoke with Gaddy's sister, Barbara Gaddy, and asked her to come to Birmingham to testify; however, she would not come. McBrayer testified that he believed that there was nothing that he and DelGrosso could have done to provide any better representation.
The record shows that Gaddy was examined by two state experts before trial. Dr. C.J. Rosecrans interviewed Gaddy at the city jail. Dr. Rosecrans's findings stated, in part:
 "[Gaddy] was cooperative with all other aspects of the examination. Speech was appropriate, goal-directed, responsive to questions, and modulated. Thought was logical and well-processed. No evidence of thinking disorder or other psychosis was evidenced. Cognitive processing, recent and remote memory, were intact and he exhibited no evidence of mental deficiency nor functional psychiatric disorder at this time. He did not graduate from high school but reports acquisition of a GED."
(C.R. 1375.) It was also Dr. Rosecrans's opinion that Gaddy did not suffer from any mental disorder when he committed the murder. Based on this report counsel had *Page 1163 
no reason to doubt Gaddy's mental condition.
At trial, Gaddy's defense was that he killed Caldwell in self-defense. In order to discredit the statements that Gaddy had given to police, counsel went to great lengths to locate Katrina Ward, a witness who could corroborate part of Gaddy's changed story — the story that was consistent with Gaddy's trial testimony.
The record clearly shows that this is not a case where no investigation was conducted. Indeed, the opposite appears to be true. Gaddy failed to show that the investigation conducted by counsel was not reasonable, given the facts of this case.
 4.
Gaddy argues that counsel failed to procure necessary expert assistance. Specifically, Gaddy contends that counsel should have procured the services of a mental-health professional, an investigator, a forensic pathologist, a crime-scene expert, and a jury psychologist.
The circuit court made the following findings of fact on this claim:
 "Gaddy first alleges IAC [ineffective assistance of counsel] for failure to obtain mental health testimony that would have `explained the likely causes and consequences of Mr. Gaddy's mental, behavioral and emotional problems.' At the guilt phase, however, such testimony would have only been relevant to prove a defense of not guilty by reason of mental disease or defect. There is no testimony before this Court that would establish that such a defense was reasonably available or that the failure to pursue such a defense was unreasonable.
 "Instead, defense counsel pursued a defense that Gaddy killed Caldwell in self-defense. Indeed, according to [Gaddy's] own testimony, the issue was not that he was unable to appreciate the nature and quality of wrongfulness of his acts, but rather that he had to kill Caldwell because Caldwell was trying to stick Gaddy with a knife. Mental health testimony would not offer Gaddy assistance in furthering this claim.
 ". . . .
 "Gaddy alleges IAC based on the failure to seek the assistance of an investigator. As discussed above, Attorney DelGrosso used his prior experience as a police officer to investigate on Gaddy's behalf. Gaddy had the assistance of an effective investigative mind, as shown by the discovery of witness Katrina Ward. Thus, trial counsel were not required to request the assistance of an investigator to perform their duties in a constitutionally reasonable manner.
 "Further, Gaddy has failed to demonstrate prejudice. Gaddy has failed to show that an investigator, had one been retained, would have discovered evidence that would establish a reasonable probability that but for counsel's failure to obtain an investigator, Gaddy's guiltphase would have had a different outcome. Thus, Gaddy failed to establish prejudice under Strickland, requiring denial of this claim.
 "In paragraph 37, Gaddy alleged IAC based on trial counsel's failure to obtain the assistance of a forensic pathologist. Gaddy presented no evidence on this claim. As Gaddy has abandoned this claim, it is denied. AR.Cr.P., 32.3.
 "Paragraph 38, involving trial counsel's failure to obtain a crime scene expert, is denied for the same reason as paragraph 37, above.
 "Paragraph 39, was similarly abandoned. Gaddy alleged IAC based on trial counsel's failure to employ a jury selection expert. First, this Court notes that `jury selection experts' are not normally employed by criminal defense attorneys *Page 1164 
in Jefferson County, Alabama. There is no possible way employing this type of expert could be considered necessary to render reasonably effective assistance as a lawyer. Further, trial counsel did what they could under the circumstances to get some limited assistance in selecting a jury. Thus, this claim is denied."
(C.R. 45-17.) The circuit court's findings are more than supported by the record, and we adopt those findings.
 5.
Gaddy argues that counsel was ineffective for failing to argue numerous motions. Specifically, he argues that counsel failed to challenge the composition of the grand and petit juries, failed to challenge Gaddy's indictment, failed to move for a change of venue, failed to adequately argue that there was insufficient evidence to support the robbery basis of the capital-murder charge, failed to move for a continuance, failed to object to the court's response to a juror question, failed to adequately move to exclude gruesome photographs, and failed to adequately argue pretrial motions.
Though Gaddy makes reference to the instances, he does not allege any facts to establish that his attorneys' performance was deficient and that he was prejudiced by that deficient performance. Nor did he present any such facts at the Rule 32 hearing. Gaddy failed to satisfy the Strickland
requirements. As we stated in Daniels v. State,650 So.2d 544, 555 (Ala.Crim.App. 1994):
 "`"[Effectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made."' Stringfellow v. State, 485 So.2d 1238, 1243
(Ala.Cr.App. 1986). `Even though there were several instances where counsel could have objected, "that does not automatically mean that the [appellant] did not receive an adequate defense in the context of the constitutional right to counsel." Ex parte Lawley, 512 So.2d 1370, 1373 (Ala. 1987).' O'Neil v. State, 605 So.2d 1247, 1250
(Ala.Cr.App. 1992). As this Court observed in Graham v. State, 593 So.2d 162, 166
(Ala.Cr.App. 1991):
 "`The lawyer whose performance the appellant now attacks zealously and vigorously defended the appellant. No particular decision to object or not object, even if it is a bad decision, is in itself proof that counsel's performance fell below acceptable professional standards.'"
Gaddy failed to meet his burden of proof in regard to this claim; thus, relief was properly denied on this claim.
 6.
Gaddy argues that counsel was ineffective because of the grossly inadequate compensation set out in Alabama's indigent defense statute — § 15-12-21, Ala. Code 1975.
As this Court stated in Boyd v. State, 913 So.2d 1113,1132 n. 9 (Ala.Crim.App. 2003):
 "Alabama's appellate courts have repeatedly rejected the claim that Alabama's statutory scheme for compensating attorneys in capital cases, in and of itself, denies a defendant effective representation. See, e.g., Ex parte Grayson, 479 So.2d 76, 79-80 (Ala. 1985); Bui v. State, 111 So.2d 6, 15 (Ala.Crim.App. 1997). Boyd alleged no facts in his petition to support his claim that the compensation scheme in § 15-12-21, Ala. Code 1975, resulted in deficient performance by his trial counsel or affected the outcome of his trial. Therefore, he failed to state a claim of ineffective assistance *Page 1165 
of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."
Accordingly, relief was correctly denied on Gaddy's general claim.
 7.
Gaddy also argues that counsel was ineffective in many other ways. However, he merely recites a three-page laundry list of issues with no argument or any reference to any legal authority. This portion of Gaddy's brief totally fails to comply with the requirements of Rule 28, Ala.R.App.P.
As this Court recently stated in Jennings v. State, [Ms. CR-04-0320, February 3, 2006] ___ So.2d ___,___ (Ala.Crim.App. 2006):
 "Rule 28(a)(10), Ala.R-App.P., requires that an argument contain `the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on.' Further, `[a]uthority supporting only "general propositions of law" does not constitute a sufficient argument for reversal.' Beachcroft Props., LLP v. City of Alabaster, 901 So.2d 703, 708 (Ala. 2004), quoting Geisenhoff v. Geisenhoff 693 So.2d 489, 491 (Ala.Civ.App. 1997). See also Connerly v. Connerly, 523 So.2d 461 (Ala.Civ.App. 1988) (appellant's citations to general propositions of law that were not specifically applicable to the issues presented by the appeal do not fulfill the requirements of Rule 28, Ala. R.App.P.).
 ". . . . `It is not the job of the appellate courts to do a party's legal research. . . . Nor is it the function of the appellate courts to "make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument."' Pileri Ind., Inc. v. Consolidated Ind., Inc., 740 So.2d 1108, 1110
(Ala.Civ.App. 1999), quoting Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala. 1994). Because Jennings has failed to present sufficient argument, authority, or citation to the facts in support of this issue, we conclude that he has failed to comply with Rule 28(a)(10), and that this issue is, therefore, deemed to be waived. See, e.g., Giles v. State, 906 So.2d 963 (Ala.Crim.App. 2004), and Mumpfield v. State, 872 So.2d 205 (Ala.Crim.App. 2003)."
Gaddy has waived the one-sentence arguments that are contained in this section of his appellate brief.
 8.
Gaddy argues that he is entitled to a new sentencing hearing before the jury because, he says, his counsel failed to investigate and present mitigating evidence.
Attorney DelGrosso testified at the Rule 32 evidentiary hearing that he was the lead counsel on the case. He said that in preparation for the penalty phase he obtained the published materials from the Capital Resource Center on representing individuals charged with capital offenses. Also he and cocounsel spoke with Gaddy several times about his childhood. Gaddy was evaluated by a psychiatrist. DelGrosso spoke with Gaddy's mother, but she refused to cooperate in any way. DelGrosso also spoke with Gaddy's sister, Barbara Gaddy, who at the time of trial was living in Texas. DelGrosso made all of the arrangements for the sister to fly to Alabama to testify at Gaddy's trial, but the sister did not come for Gaddy's trial. DelGrosso testified:
 "The sister was reluctant, not only to testify, she was reluctant to talk to me. Then she decided to talk to me but she didn't really want to tell me anything. *Page 1166 
But arising from that conversation, she did tell me certain information which I thought was important, and arrangements were made to bring this woman to Birmingham. I even recollect going to the Judge and asking him about the funds to get her here and I think it was his offer to put the flight on his credit card, if I'm not mistaken, and the last conversation, I want to say the last conversation I had with the sister was that, to be perfectly honest about it, was that I had a doctor that I wanted her to talk to when she got here because I thought her testimony would be helpful to her brother, and she did not appear and it did not come to fruition."
(R. 97.)
Attorney McBrayer testified that he helped gather information for the penalty phase. He interviewed Gaddy about his childhood and prepared a family-background report on Gaddy's life. He also testified that because of the length of time that had passed he had difficulty remembering exactly what he and DelGrosso had done on the case. However, he said that he believed that he and DelGrosso had done everything they could for Gaddy.
We have examined the record of Gaddy's trial.[3] The record shows that counsel moved to compel disclosure of the aggravating circumstances the State was relying on in seeking a death sentence, moved for funds to conduct a presentence investigation, moved for funds for an examination by a private psychiatrist, moved to bar the state from calling the defendant's experts as witnesses, and moved to prohibit death-qualifying the prospective jurors. Numerous other motions typically filed in death-penalty cases were also filed.
At the penalty phase counsel called Gaddy to testify. Gaddy testified that his parents divorced when he was 2 years old; that his stepfather beat him and twice molested him; that he and his sister were sent to a home to live because his mother did not want them in the house; that when he was 16 years old he approached his father about moving in with him and his father said, "I never wanted you in the first place, you little bastard, and I don't want you now"; that he started using drugs when he was about 13 years old; and that he had been in several drugrehabilitation centers.
DelGrosso also introduced the mental-examination report that had been prepared by Dr. Rosecrans, the psychiatrist who examined Gaddy before trial. In the circuit court's sentencing order, the trial court stated the following about Dr. Rosecrans's report:
 "The Rosecrans letters report [Gaddy] as commenting about his adolescent treatment at Western Missouri Mental Health Center, previous use of narcotics, problems with his stepfather in early adolescence, repeated contact with the deceased and incidents of homosexual activity with the deceased, that the deceased irritated him by showing pictures of young boys in various states of dress and other comments that were echoed by [Gaddy] during the jury trial."
(Trial record, p. 1016.) Counsel also offered a joint stipulation that while he was in prison awaiting trial Gaddy had cooperated with authorities and had not been a discipline problem.[4] *Page 1167 
At closing arguments in the penalty phase, counsel portrayed Gaddy as a child who had been abandoned by his mother. He pleaded for the jury to sentence Gaddy to life imprisonment without parole.
The record further shows that after the jury recommended that Gaddy be sentenced to death, DelGrosso enlisted the aid of the Alabama Prison Project. At the sentencing hearing before the circuit court DelGrosso presented the testimony of Dr. Linda Bishop, a clinical psychologist in Missouri who had been employed at Western Missouri Mental Health Center and who had interviewed Gaddy when he was approximately 13 years old. She said that Gaddy was depressed and was on anti-depressant medication at that time. Bishop also said that the file indicated that he might have been abused. James Patrick Mace, an assistant professor and social worker at the University of Alabama, stated that he had reviewed Gaddy's files and the files showed that Gaddy had been physically abused and that the family environment in which he had been raised was dysfunctional.
The circuit court found no statutory mitigating circumstances but found the following nonstatutory mitigating circumstances:
 "Defendant's trial testimony, the psychologists' testimony and exhibits at third stage lead one to the inescapable conclusion that Richard Eugene Gaddy is one of life's impoverished souls, permanently scarred thru parental abuse, neglect and rejection during childhood and adolescence culminating in a dysfunctional adult life."
(Trial record, p. 1023.) The circuit court found as aggravating circumstances that the murder was committed during the course of a robbery and that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. The circuit court stated:
 "Mr. Caldwell died as a result of multiple stab wounds, having suffered nineteen incised or stab wounds — an incised wound being a slash type wound, longer than it is deep and a stab wound the reverse — deeper than wide. Also observed about the person of the deceased were general abrasions or scrapes on the forearm as well as three skin excoriations or abrasions which may have been postmortem, due to the fact no redness or inflammation was observed around the wounds.
 "[The coroner] opined that most of the abrasions were premortem and that the decedent was alive when stabbed as evidenced from the hemorrhaging from the wound sites.
 "As noted above, [the coroner] opined that there was, in addition to the knife wounds and abrasions described, evidence of `severe strangulation' but that [Mr. Caldwell] did not die as a result of being strangled.
 "[Gaddy's] testimony was corroborative of [the coroner's] testimony with reference to the cutting and stabbing as well as the strangulation episode.
 "The undersigned concludes that based on the evidence and the applicable caselaw this capital offense was in fact one of `those conscienceless or pitiless homicides unnecessarily torturous to the victim as compared to other capital cases.' [Ex parte] Kyzer, 399 So.2d 334 [(Ala. 1981)]."
(Trial record, p. 1019-20.)
In regard to this claim, the Rule 32 court made the following findings of fact:
 "[T]he Court does not find deficient performance on the part of trial counsel in the penalty phase, as Gaddy did not establish facts that would show deficient performance by trial counsel in 1991. Attorney McBrayer prepared a history *Page 1168 
of Gaddy's life to aid in the presentation of penalty phase mitigation evidence. Attorney DelGrosso was present during the State's psychiatric examination of Gaddy by Dr. Rosecrans. Counsel attempted to contact Gaddy's mother, but she would have nothing to do with their efforts. The Court notes that Gaddy's mother was not called as a witness during the evidentiary hearing. While Gaddy's sister provided additional information, counsel's efforts to bring her to Alabama to testify ultimately failed due to her reluctance to get involved in the case. Gaddy's sister also failed to make an appearance at the evidentiary hearing.
 "Counsel had contacted a psychiatrist, Dr. Parker, to determine whether Gaddy's confession was voluntary. Although ultimately unsuccessful, counsel attempted to obtain medical records from the Army concerning Gaddy's childhood. Counsel spoke with Gaddy about his upbringing, and ultimately presented the jury with the evidence of Gaddy's poor upbringing and abuse.
 "Counsel's efforts must be reviewed in context, as well. Gaddy was a transient in the Birmingham, Alabama, area. He did not have friends and family in the area that counsel could rely on. In fact, Gaddy's adult life was marked by his transient nature, roaming from place to place. Gaddy does not appear (on the record of trial or the evidentiary hearing) to have had developed meaningful relationships with any people who would have been willing to assist in a mitigation case. His friends in South Carolina were incarcerated and were of questionable mitigation value, considering their criminal exploits.
 "Quite simply, the record shows that Gaddy's family, his mother, sister, and stepfather, did not want anything to do with him. In fact, trial counsel did the only thing that reasonable counsel could have done with this fact by using it to establish a valid non-statutory mitigating factor showing his abandonment by his family.
 "Even more important is what the record does show. Under the circumstances, with no family support and no friends to draw upon, it does not appear that Gaddy was overly helpful in giving his trial counsel leads to follow in preparing a mitigation case. Chandler [v. United States], 218 F.3d [1305] at 1318 [(11th Cir.2000)] ('Because the reasonableness of counsel's acts (including what investigations are reasonable) depends "critically" upon "information supplied by the [petitioner]" or "the [petitioner's] own statements or actions," evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims.'). It does not appear that Gaddy assisted his counsel in locating individuals who wanted to help with mitigation, as opposed to his uncooperative family. Even in the evidentiary hearing, Gaddy does not appear to have helped his current counsel develop leads to any promising lay witnesses for use in mitigation, other than Leonard Monteer, an adult who had known Gaddy as a young teenager some thirteen years before the commission of this offense.
 "The record shows that trial counsel worked with what mitigation evidence they had and could obtain under the circumstances. Counsel obtained a stipulation that Gaddy had not been a problem inmate since his incarceration, valid mitigation evidence under Skipper [v. South Carolina, 476 U.S. 1 (1986)]. Gaddy also had the report of Dr. Rosecrans introduced into evidence by stipulation. As noted above, counsel used *Page 1169 
Gaddy's abandonment by his family to their advantage. Counsel tried to get some records from Gaddy's childhood, but were unable to do so.
 "Attorney DelGrosso had previously handled penalty phase litigation before, including obtaining a life without parole sentence. In addition, Attorney DelGrosso used various resources that were available to counsel at the time to aid in death penalty litigation. The Court also notes that Attorney DelGrosso had assisted other well-respected defense attorneys in Jefferson County in capital cases, giving him a great practice background.
 "The record further shows that trial counsel, recognizing one last chance to try and present evidence to save Gaddy's life, retained Neil Hartley as a mitigation specialist. In addition, counsel worked with two experts, a social worker and a psychologist, in an effort to present further reasons for sparing Gaddy's life. Although this is more appropriately discussed in the sentencing phase IAC [ineffective assistance of counsel] claim, below, it does bear some relevance to this analysis.
 "After retaining a social worker and psychologist to assist in preparing for the sentencing phase, counsel did not present any further mitigation lay witnesses during the sentencing phase. Not a single family member, friend, or other lay person was obtained through the use of `experts,' highly touted by petitioner's collateral counsel. Thus, it is not at all clear that these experts would have been able to bring any additional evidence to the table, other than to recount the details of the abuse, abandonment, and neglect testified to by Gaddy.
 "When reviewed under the prevailing legal norms which existed in 1991, the Court finds that trial counsel performed reasonably in preparing for and pursuing a mitigation phase strategy. There is no evidence before this Court that counsel could have done anything further to counter the State's evidence showing aggravating circumstances. Although counsel put much effort into trying to disprove the robbery/murder charge, they were ultimately unsuccessful and were very reasonable in not trying to rehash such a claim during the penalty phase. The facts indicate that the stabbing death of the victim was especially heinous, atrocious, and cruel. Accordingly, trial counsel had no chance to deflect the State's aggravating factors, and collateral counsel have not established facts that would show otherwise.
 "Furthermore, although counsel ultimately retained a social worker and psychologist to testify on Gaddy's behalf, none of these witnesses diagnosed Gaddy with a condition or illness that would constitute a statutory mitigating factor. Not even the expert retained by Gaddy for this evidentiary hearing could diagnose Gaddy with a recognized mental illness or condition. The record suggests that each time counsel contacted a mental health professional . . . no potential mental health issues were brought to their attention. Thus, there does not appear to have been available to counsel any information that would suggest the absolute need for `expert' assistance.
 "Under the circumstances of this case, the Court finds that in 1991 reasonable competent counsel could have decided that — [given] the fact of uncooperative family members, the transient nature of [Gaddy], the absence of any true, long-term friendships to draw upon, the inability to get the Army records requested, the failure of those mental health professionals consulted to raise any `red flags,' the willingness of counsel to seize *Page 1170 
upon the absence of any indication that Gaddy gave his counsel useful leads for producing more mitigation evidence — that what was undertaken in Gaddy's behalf was reasonable. As a result, the Court does not find that [Gaddy] has established deficient performance or prejudice.
 "The Court, then, finds that Gaddy received the constitutionally required assistance of counsel during the penalty phase proceedings at his capital murder trial."
(C.R. 62-68.)
The circuit court's findings are supported by the record. At the Rule 32 hearing Gaddy presented the testimony of no family members. Gaddy called his two trial attorneys; Leonard Monteer, a former neighbor of Gaddy's; Lucia Penland, executive director of the Alabama Prison Project; Neil Hartley, a mitigation investigator; and Dr. Marti Loring, a social worker and sociologist.
Leonard Monteer testified that when Gaddy was about 11 or 12 years of age he lived in a house behind Monteer. He said that on several occasions he had seen Gaddy's stepfather hit Gaddy. However, he also said that he had been contacted by defense counsel before Gaddy's trial. Neither DelGrosso or McBrayer were questioned as to why Monteer did not ultimately testify at the penalty phase. We must assume that it was a strategic decision not to call Monteer at the penalty phase.[5]
Lucia Penland testified that the Alabama Prison Project had prepared a manual to assist lawyers in preparing and gathering mitigation evidence. She said that the institute also would assist attorneys in preparing mitigation. Penland testified that DelGrosso contacted her after the jury had recommended that Gaddy be sentenced to death.
Neil Hartley testified that he conducted a mitigation investigation after DelGrosso contacted Penland and obtained copies of reports from various institutions where Gaddy had been placed as a child. The files showed comments that Gaddy had made to medical personnel that Gaddy had been abused as a child.[6]
The records also showed that Gaddy had been diagnosed as depressed and that he had a substance-abuse problem at a early age.
 "When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is `a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' Strickland [v. Washington], 466 U.S. [668,] at 695, 104 S.Ct. [2052,] at 2069 [(1984)]."
Stafford v. Saffle, 34 F.3d 1557, 1564 (10th Cir.1994).
 "`A defense attorney is not required to investigate all leads, however, and "there is no per se rule that evidence of a criminal defendant's troubled childhood must always be presented as mitigating evidence in the penalty phase of a capital case."' Bolender [v. Singletary], 16 F.3d [1547,] at 1557 [(11th Cir.1994)] (footnote omitted)(quoting Devier v. Zant, 3 F.3d 1445, 1453 (11th Cir.1993), cert. denied, [513] U.S. [1161], 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995)). *Page 1171 
`Indeed, "[c]ounsel has no absolute duty to present mitigating character evidence at all, and trial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel."' Bolender, 16 F.3d at 1557 (citations omitted)."
Marek v. Singletary, 62 F.3d 1295, 1300 (11th Cir.1995).
Last, the United States Supreme Court in Wiggins v.Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital trial, stated:
 "In Strickland [v. Washington, 466 U.S. 668
(1984)], we made clear that, to establish prejudice, a `defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id., at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."
539 U.S. at 534,123 S.Ct. 2527.
We have independently reweighed the mitigating evidence that was not presented against the aggravating circumstances that were proven by the State. Gaddy brutally stabbed to death the victim during the course of a robbery. Given the aggravating circumstances that were proven by the State, we are confident that death was the appropriate punishment for Gaddy's actions.
For the foregoing reasons, relief on this claim was properly denied.
 III.
Gaddy also argues that his appellate counsel's performance was deficient. He recites a four-page laundry list of reasons why appellate counsel's performance was deficient.
This section of Gaddy's brief fails to comply with the requirements of Rule 28(a)(10), Ala.R.App.P. Accordingly, Gaddy has waived this argument on appeal. See Jennings v.State, supra.
Furthermore, when denying relief on this claim, the circuit court made the following findings:
 "Gaddy failed to support his claim with any evidence whatsoever. Based on his failure to carry his burden of proof, this claim is denied. A.R.Cr.P., 32.3.
 "Furthermore, a review of the Court of Criminal Appeals' opinion affirming Gaddy's conviction and sentence demonstrates the thorough and competent job done by appellate counsel in this case. Gaddy, 698 So.2d 1100. The question is not whether more could have been done, but whether those issues raised on appeal were issues that reasonably competent counsel could have raised. That more could have been raised is not at issue."
(Supp.R. 106.)
Moreover, as we stated in DeBruce v. State,890 So.2d 1068, 1093-94 (Ala.Crim.App. 2003):
 "A defendant has the right to the effective assistance of counsel in his appeal to this Court. See Cochran v. State, 548 So.2d 1062 (Ala.Crim.App.), cert. denied, 493 U.S. 900, 110 S.Ct. 259, 107 L.Ed.2d 208
(1989). DeBruce argues on appeal that his appellate counsel should have raised an additional 33 issues before this Court. Mathis represented DeBruce on appeal and signed the brief prepared by the anti-death-penalty organization known as the Equal *Page 1172 
Justice Initiative. The brief presented 13 issues, and this Court issued a very lengthy opinion addressing those issues. `"[W]e emphasize that the right to effective assistance of appellate counsel does not require an attorney to advance every conceivable argument on appeal which the trial record supports." Gray v.Greer, 778 F.2d 350 at 353 (7th Cir.1985) (emphasis added [in Cochran]), citing Evitts v. Lucey,469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).' Cochran,548 So.2d at 1069-70.
 "`"[Experienced advocates have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. Selecting the most promising issues for review has assumed a greater importance in an era when the time for oral argument is strictly limited in most courts and when page limits on briefs are widely imposed."'
"Boyd v. State, 746 So.2d 364, 403 (Ala.Crim.App. 1999), quoting Jones v. Barnes, 463 U.S. 745, 746,103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)."
 IV.
Gaddy further asserts that the cumulative effect of the instances of ineffective assistance of counsel warrants relief.
As this Court recently stated in Brooks v. State,929 So.2d 491, 514 (Ala.Crim.App. 2005):
 "Other states and federal courts are not in agreement as to whether the `cumulative effect' analysis applies to Strickland claims. As the Supreme Court of North Dakota noted in Garcia v. State, 678 N.W.2d 568, 578 (N.D. 2004):
 "`Garcia argues that even if trial counsel's individual acts or omissions are insufficient to establish he was prejudiced, the cumulative effect was substantial enough to meet Strickland's test. See Williams v. Washington, 59 F.3d 673, 682 (7th Cir.1995) ("In making this showing, a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet Strickland's test"); but see Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir.1990) ("cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own").'
 "See also Holland v. State, 250 Ga.App. 24, 28, 550 S.E.2d 433, 437 (2001) ('Because the so-called cumulative error doctrine is inapplicable, each claim of inadequacy must be examined independently of other claims, using the two-prong standard of Strickland v. Washington.' (footnote omitted)); Carl v. State, 234 Ga.App. 61, 65, 506 S.E.2d 207, 212
(1998) ('Georgia does not recognize the cumulative error rule.'); Fisher v. Angelone, 163 F.3d 835, 852
(4th Cir.1998) ('Not surprisingly, it has long been the practice of this Court to individually assess claims under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See, e.g., Hoots v. Allsbrook, 785 F.2d 1214, 1219 (4th Cir. 1986) (considering ineffective assistance claims individually rather than considering their cumulative impact.).').
 "We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective assistance of counsel. However, the Alabama Supreme Court has held that the cumulative effect of prosecutorial misconduct necessitated a new trial in Ex parte Tomlin, 540 So.2d 668, 672 (Ala. 1988) ('We need not decide whether either of the two errors, standing alone, would require a reversal; we hold that *Page 1173 
the cumulative effect of the errors probably adversely affected the substantial rights of the defendant and seriously affected the fairness and integrity of the judicial proceedings.'). Also, in Ex parte Bryant, 951 So.2d 724 (Ala. 2002), the Supreme Court held that the cumulative effect of errors may require reversal.
 "If we were to evaluate the cumulative effect of the ineffective assistance of counsel claims, we would find that Brooks's substantial rights were not injuriously affected. See Bryant and Rule 45, Ala.R.App.P."
Likewise, if we were to evaluate the cumulative effect of the instances of alleged ineffective assistance of counsel, we could find that Gaddy's substantial rights had not been injuriously affected.
 V.
Gaddy further asserts that his sentence violates the United States Supreme Court's decisions in Ring v. Arizona,536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendiv. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435
(2000).
The United States Supreme Court in Apprendi held that any fact that increases a punishment above the statutory limit must be presented to a jury and proven beyond a reasonable doubt.Ring extended this holding to death-penalty cases.
In Brooks, supra, we held:
 "[T]he Supreme Court's decision in Ring does not apply retroactively to cases on collateral review. See McWilliams v. State, 897 So.2d 437
(Ala.Crim.App. 2004). The United States Supreme Court in Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519 (2004), specifically held that its decision in Ring did not apply to death cases that were already final at the time that the decision was announced."
929 So.2d at 513. Gaddy's case was final in July 1997, when this Court issued the certificate of judgment. Accordingly,Ring does not apply to this case.
However, even if Ring and Apprendi applied to this case, there would be no violation of those holdings. The jury convicted Gaddy of murdering Caldwell during the course of a robbery. The felony that elevated the murder to capital murder and made it punishable by death was found by the jury to exist beyond a reasonable doubt. Thus, Gaddy's death sentence does not violate Ring and Apprendi. See Ex parteWaldrop, 859 So.2d 1181 (Ala. 2002).
 VI.
The following issues are procedurally barred in a postconviction proceeding because they could have been, but were not, raised at trial or on appeal. See Rule 32.2(a)(3) and 32.2(a)(5), Ala.R.Crim.P.
 A. Whether the prosecutor engaged in misconduct that denied Gaddy a fair trial and a fair sentencing determination;
 B. Whether the trial court erred during Gaddy's trial, denying him a fair trial and sentencing determination;
 C. Whether counsel had adequate time to prepare a defense;
 D. Whether the court improperly proceeded with a hearing outside of Gaddy's presence;[7]
 E. Whether the failure to fully transcribe all court proceedings deprived Gaddy of a full appeal;
 F. Whether pretrial publicity made it impossible for Gaddy to receive a fair trial in Jefferson County; *Page 1174 
 G. Whether race and gender discrimination in the formation of the grand and petit juries denied Gaddy a fair trial;
 H. Whether Caddy's sentence was determined in an unconstitutional manner contrary to the law of Alabama and the United States Constitution;
 I. Whether Alabama's sentencing scheme is vague and violates the constitution;
 J. Whether Caddy's death sentence constitutes cruel and unusual punishment; and
 K. Whether Caddy's sentence violates international law.
For the foregoing reasons, the circuit court correctly denied Caddy's postconviction petition. The conviction and sentence in this case is due to be, and is hereby, affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.
[1] Section 13A-5-54, Ala. Code 1975, states:
 "Each person indicted for an offense punishable under the provisions of this article who is not able to afford legal counsel must be provided with court appointed counsel having no less than five years' prior experience in the active practice of criminal law."
[2] For the first time on this appeal from the denial of his Rule 32 petition, Gaddy argues that counsel was deficient at the suppression hearing because he interviewed one of the South Carolina police officers over the telephone. Gaddy also argues for the first time that counsel failed to interview the other individuals who were arrested with Gaddy in South Carolina. Because these claims are raised for the first time on appeal they are not properly before this Court. See Arlington v.State, 716 So.2d 237, 239 (Ala.Crim.App. 1997).
[3] This Court can take judicial notice of its records in a previous related appeal. See Ex parte Salter,520 So.2d 213, 216 (Ala.Crim.App. 1987).
[4] This is considered possible mitigation evidence. SeeSkipper v. South Carolina, 476 U.S. 1,106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).
[5] "[It] is not our function to second-guess the strategic decisions made by counsel." Smith v. State,756 So.2d 892, 910 (Ala.Crim.App. 1997), aff'd, 756 So.2d 957
(Ala. 2000).
[6] The information in these files was similar to the information contained in Dr. Rosecrans's report that was submitted to the jury in the sentencing phase.
[7] This issue was also raised and addressed on direct appeal and is barred for that reason.